Present:  All the Justices

ROBERT L. SANSOM

v.  Record No. 981492  OPINION BY JUSTICE CYNTHIA D. KINSER
                                            April 16, 1999
BOARD OF SUPERVISORS OF
MADISON COUNTY

FROM THE CIRCUIT COURT OF MADISON COUNTY
Lloyd C. Sullenberger, Judge


Robert L. Sansom (Sansom) owns a 191-acre tract of real estate located in Madison County (the County).  In order to effect a subdivision of this tract of land, Sansom had a plat prepared depicting a division of the 191 acres into parcel C, containing 48.788 acres, and parcel D, containing 70.385 acres, leaving a residual parcel (the residue) of 71.886 acres.[1]  A 9.29-acre, closed landfill that the County formerly operated is located wholly within the residue.  The area previously used as a landfill is the focus of the controversy in this appeal.

Pursuant to Article 4-3-1, Madison County, Virginia, Subdivision Ordinance (Mar. 29, 1974, as amended) (the Ordinance),[2] the circuit court determined that a

_____
    [1] The subdivision plat did not include the boundaries of the residue.

    [2] Article 4-3-1 of the Ordinance provides as follows:

    Flood Plains and Drainage Courses.  When any stream or substantial surface drainage course is located in the

"substantial surface drainage course" is located on the landfill area and, consequently, upheld the County's denial of Sansom's application to approve his subdivision plat. According a presumption of correctness to the court's factual findings, we conclude that the court properly held that the County based its denial on the applicable ordinance and that its decision was neither arbitrary nor capricious.  Thus, we will affirm the judgment of the circuit court.

## I.

On March 7, 1997, Sansom submitted to the County an application for approval of his subdivision plat.  During a joint meeting of the Madison County Board of Supervisors (the Board) and the Madison County Planning Commission (the

_____

area being subdivided, no land disturbing activity except to build approved bridges shall be permitted within fifty (50) feet of the stream or drainage course, and provisions may be required for an adequate easement along the stream or drainage course for the purpose of widening, deepening, relocating, improving, or protecting the streams or drainage course for drainage purposes.  Such easements shall not be considered part of the required road width.  Flood plain limits shall be established with reference to current flood plain maps or by current soil survey and engineering methods, and shall be furnished to the Board of Supervisors or its agent by the subdivider. To insure development of lots containing sufficient land upon which to place structures without impeding natural drainage, the subdivider may be required to provide elevation and flood profiles.

Commission) on April 2, 1997, the Commission members expressed concern about Sansom's plan to construct a road over the landfill in order to provide access to the residue from Route 652. The Commission considered a letter dated January 9, 1997, from Robert M. Roberts, P.E. (Roberts), to the County Administrator, in which Roberts suggested that, if Sansom followed certain recommendations for building the access road, it would not create any adverse effects with regard to the closed landfill. Sansom's attorney advised the Commission that his client was willing to construct the road in accordance with the standards outlined in Roberts' letter but that Sansom would not accept a drainage easement prohibiting any land disturbing activity in the landfill area that would alter the existing drainage course.

The Commission recommended to the Board that Sansom's application be denied based on the following articles of the Ordinance: "Article 1, second paragraph, Article 4-1-4, Article 4-3-1, Article 4-4-6 and Article 5-3." The Board then convened its meeting and subsequently denied Sansom's application "because of concern about the risk

that might be created by a new access road across the closed landfill."[3]

On May 29, 1997, Sansom filed an "Appeal and Motion to Approve Subdivision Plat" in the circuit court pursuant to Code § 15.1-475(B)(3) (now § 15.2-2259(C)).  Sansom alleged that the Board's decision was not "properly based upon the Madison County Subdivision Ordinance under the articles specified in writing on the plat, and that the provisions of the local ordinance, as construed by the [Board], are beyond the authority granted by the enabling statutes." Sansom further asserted that the Board's disapproval of his application was arbitrary and capricious because the decision was based on reasons other than those provided by

_____
[3] Pursuant to Code § 15.1-475(B)(1) (now § 15.2-2259(A)), the County Administrator wrote the following reasons for denial on Sansom's subdivision plat:

>     Denied by Madison County Board of Supervisors on April 2, 1997, under Article 1, Article 4-1-4, Article 4-3-1, Article 4-4-6 and Article 5-3 due to concern about risk of proposed access road to residue over the closed landfill.  Relocation of proposed access road to residue so that it does not cross closed landfill required.

The General Assembly repealed Title 15.1 effective December 1, 1997, in Acts of Assembly 1997, c. 587.  Since Title 15.1 was in effect during all times relevant to this appeal, we will cite Title 15.1 with references to the corresponding sections in Title 15.2.

4

the Board.  Finally, Sansom alleged that the request by the Board for a drainage easement over the entire area of the old landfill, which would in effect prohibit any land disturbing activity in that area, was an unconstitutional taking of land without compensation.

After the court denied Sansom's motion for summary judgment and the Board's motion for partial summary judgment in a decree dated March 4, 1998, this matter proceeded to a bench trial on March 16, 1998.  During that trial, testimony from several witnesses established the following facts relevant to this appeal.

The residue fronts on Route 652 for 1,851.8 feet.  The former landfill area runs parallel with all but 50 feet of that road frontage.  The state highway department would not authorize a road entrance from Route 652 into the residue within the 50-foot frontage outside the former landfill area because of inadequate sight distance along the highway.  The department did, however, approve access from Route 652 into the residue at a point along the road frontage where the closed landfill is situated.  A road going from that point to the remaining section of the residue would traverse the landfill.

The licensed land surveyor who prepared the subdivision plat described the landfill area as a pasture

that slopes generally downward from west to east, with some depressions typical of those in any field, and that contains an area on the southern edge where surface drainage flow concentrates. He noticed the presence of some check dams that had been constructed to help control erosion. Although the surveyor acknowledged that he saw evidence of surface water drainage on the landfill area, he denied seeing a "substantial surface drainage course" across the landfill.

Roberts testified that the drop in elevation of the landfill area from west to east is approximately 70 feet. His physical examination of the landfill revealed the presence of three drainage swales that run from west to east. Two of the swales eventually run out, and surface drainage from them becomes sheet flow that continues to travel in a southeasterly direction until it reaches the remaining swale near the perimeter of the landfill. The residue also contains six check dams, five of which are located within the area of the landfill cover. These check dams are used for erosion and sedimentation control and to lessen the velocity of the surface drainage. Finally, three earthen berms are located on the landfill that also aid in the prevention of erosion.

Based on his calculations of the amount of runoff for a 2, 10, 25, and a 100-year storm event, Roberts opined that there is substantial runoff from properties adjacent to the landfill and from the landfill itself and that the runoff could create erosion problems and infiltrate the landfill. He also stated that, if the flow of the surface water is impeded and allowed to collect, it could cause generation of leachate from the landfill. Finally, based on his examination of the site and its physical features, Roberts responded affirmatively to a question regarding whether the drainage flow across the landfill is a substantial surface drainage force. Nevertheless, Roberts maintained his position that a road could be constructed across the landfill without adverse consequences if it were built in accordance with the recommendations that he had made in his letter to the County Administrator.

Upon considering the evidence presented during the trial, the circuit court determined that the Board properly applied Article 4-3-1 of the Ordinance. The court reasoned that

> evidence of a combination of drainage structures . . . over the closed landfill constitute a substantial surface drainage course located on the residue within the area being subdivided and the board was justified in requiring an easement prohibiting land-disturbing activity including the roadway within this area.

The court further stated, "Since the law permits the board to protect drainage in a subdivision, that the primary concern is the closed landfill, does not make the requirement that the road be located other than across the landfill arbitrary or capricious."[4]

On April 22, 1998, the circuit court entered a final decree dismissing with prejudice Sansom's appeal and motion for the reasons stated in the record. Sansom appeals.

## II.

Code § 15.1-466(A)(3) (now Code § 15.2-2241(3)) provides that "[a] subdivision ordinance shall include reasonable regulations and provisions that apply to or provide . . . [f]or adequate provisions for drainage and flood control . . . ." Pursuant to the directive contained in this section, the County enacted Articles 4-3-1, 4-3-2, and 4-3-3 to deal with flood plains and drainage courses, flood control and drainage structures, and erosion control, respectively.

_____

[4] The Court also concluded that it was unnecessary to determine whether Article 4-4-6 of the Ordinance, concerning drainage easements, is applicable and that Article 5-3, concerning road access, does not pertain to this case.

In its previous decision denying summary judgment, the court had determined that references to Article 1 and Article 4-1-4 on the subdivision plat were not relevant to any alleged deficiencies in the plat.

Article 4-3-1, the provision at issue in this appeal, does not define the term "substantial surface drainage course," nor is it defined elsewhere in the County's Ordinance. "When . . . a statute contains no express definition of a term, the general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used." Hubbard v. Henrico Ltd. Partnership, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998) (citing City of Virginia Beach v. Flippen, 251 Va. 358, 362, 467 S.E.2d 471, 473-74 (1996); Marsh v. City of Richmond, 234 Va. 4, 11, 360 S.E.2d 163, 167 (1987)). An undefined term must be "given its ordinary meaning, given the context in which it is used." Dep't of Taxation v. Orange-Madison Coop. Farm Serv., 220 Va. 655, 658, 261 S.E.2d 532, 533-34 (1980). "The context may be examined by considering the other language used in the statute." City of Virginia Beach v. Bd. of Supervisors of Mecklenburg County, 246 Va. 233, 236-37, 435 S.E.2d 382, 384 (1993).

On brief, Sansom argues that the term "substantial surface drainage course" must be construed as a "prominent, well-defined topographical feature such as a creek bed, ravine or gully in which surface water concentrates and through which it is channeled . . . away." He asserts that it cannot encompass a nine-acre, gently-sloping, grass-

covered, "cow" pasture.  However, the County used the disjunctive "or" in the opening phrase of Article 4-3-1: "When any stream or substantial surface drainage course is located in the area being subdivided."  (Emphasis added.)  Thus, we conclude that the County did not intend for the terms "substantial surface drainage course" and "stream" to denote the same kind of topographical features.  Sansom's interpretation of the phrase "substantial surface drainage course" would "violate the settled principle of statutory construction that every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary."  Hubbard, 255 Va. at 340-41, 497 S.E.2d at 338 (citing Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 405, 468 S.E.2d 905, 909 (1996); Raven Red Ash Coal Corp. v. Absher, 153 Va. 332, 335, 149 S.E. 541, 542 (1929)).

Sansom also assigns error to the circuit court's conclusion that a "substantial surface drainage course" is located on the closed landfill.  He asks this Court to reverse the judgment of the circuit court and to order that his subdivision plat be approved for recordation as submitted to the County.

In reviewing the circuit court's judgment, we accord a presumption of correctness to the factual findings in favor

10

of each party.  West v. Mills, 238 Va. 162, 168, 380 S.E.2d 917, 920-21 (1989).  In addition, Code § 15.1-475(B)(3) (now Code § 15.2-2259(C)) limits the circuit court's review to a determination of whether the County's disapproval of Sansom's subdivision plat was "'not properly based on the ordinance applicable thereto, or was arbitrary or capricious.'"  238 Va. at 168, 380 S.E.2d at 920 (quoting Code § 15.1-475); accord Hanover County v. Bertozzi, 256 Va. 350, 355, 504 S.E.2d 618, 620 (1998).

Using these principles, we find that the circuit court properly determined that a "substantial surface drainage course" is situated on the landfill area of the residue. As the County noted, Roberts testified that significant surface drainage flows across the landfill area from adjacent properties and from the former landfill itself. When specifically asked if the drainage flow across the landfill is a substantial surface drainage force, he responded affirmatively.  The presence of drainage swales, earthen berms, and check dams in the landfill area confirms the volume of surface drainage and the need to control the flow of water and to prevent erosion.  Even the land surveyor testifying as a witness for Sansom acknowledged the presence of check dams and an area on the southern edge of the landfill where surface drainage flow concentrates.

11

Thus, we conclude that the County's denial of Sansom's application to approve his subdivision plat was properly based on the applicable ordinance and was not arbitrary or capricious. Under the terms of Article 4-3-1, the County was justified in permitting no land disturbing activity, including the construction of the access road, in the area where the closed landfill is situated. The fact that the County's decision also alleviates its concerns with regard to the risks that might be created by constructing an access road across the former landfill does not change our conclusion.

Finally, Sansom summarily argues that a predicate for the application of Article 4-3-1 is that a "substantial surface drainage course" actually be "located in the area being subdivided." He contends that the area being subdivided is parcel C and parcel D, not the residue where the landfill is located, and that, therefore, Article 4-3-1 is not applicable. We find no merit in this argument because it ignores the definition of the term "subdivision" in Article 2-38 of the Ordinance: "The divisions of a lot, tract or parcel of land into two or more lots, tracts or parcels . . . ." The parcel of land being subdivided is Sansom's 191-acre tract, which includes the residue and thus the closed landfill.

12

For the reasons stated, we will affirm the judgment of the circuit court.[5]

<u>Affirmed</u>.

_____
[5] We do not need to address Samson's remaining assignment of error regarding whether the residue constitutes a "lot" under Article 4-4-6 of the Ordinance.