COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, Beales and Huff
Argued at Salem, Virginia


BENJAMINE LEONARD FOLEY, II

                                                    OPINION BY
v.        Record No. 0619-13-3          JUDGE ROBERT J. HUMPHREYS
                                                    MARCH 25, 2014

COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF ROANOKE COUNTY
                    James R. Swanson, Judge

        (Neil A. Horn, on brief), for appellant.  Appellant submitting on
        brief.

        Victoria Johnson, Assistant Attorney General (Kenneth T.
        Cuccinelli, II, Attorney General, on brief), for appellee.


        Benjamine Leonard Foley, II, ("Foley") appeals his conviction for carrying a concealed

weapon in violation of Code § 18.2-308(A) by the Roanoke County Circuit Court (the "trial

court").  Foley's single assignment of error is that the "trial court erred when it found the

easement over Foley's property was excluded from being considered part of the curtilage of his

dwelling," and therefore Foley could not avail himself of the exception provided in Code

§ 18.2-308(B).

                                I. BACKGROUND

        "On appeal, we view the facts established at trial in the 'light most favorable' to the

prevailing party below, in this case the Commonwealth, and we grant to that party all fair

inferences flowing from those facts."  Crawford v. Commonwealth, 55 Va. App. 457, 462 n.1,

686 S.E.2d 557, 559 n.1 (2009) (citations omitted).  In this light, the evidence establishes the

following.

Holly Tree Road is a one-mile-long, privately maintained, dead-end, dirt road that is "long, narrow, and winding." Holly Tree Road bisects Foley's four-acre property—that portion of the road is still Foley's property but is subject to a non-exclusive easement. Where Holly Tree Road crosses Foley's property, on one side is Foley's house, and on the other side is his "garage" and/or "junkyard" where Foley keeps his farm equipment and "a bunch of scrap stuff for working on whatever."

Foley's residence is the second to last house, and Thomas Smallwood's ("Smallwood") residence is the last house before Holly Tree Road dead ends. Smallwood's property was gifted to him by deed in 1988 by Foley. In the 1988 deed, Foley and his wife also conveyed to Smallwood "an 18-foot wide easement over their remaining property for the purposes of ingress and egress to a private road[,] which is the subject of a non-exclusive easement to the parties of the first part [Foley and his wife]." This easement allows Smallwood to access his house at the end of Holly Tree Road. There are fifteen other residences on Holly Tree Road, however those homes are all located before Foley's property.

On the evening of March 21, 2012, Smallwood called his brother-in-law and next-door neighbor, Foley, to ask for a favor. Smallwood told Foley that his daughter (Foley's niece) and granddaughter were alone in Smallwood's house. Moments earlier, his daughter's boyfriend threatened to harm them and was en route to Smallwood's house. Smallwood asked Foley to block the road and not let anyone through to his house until the police arrived, who were also on their way to Smallwood's house.

When the Roanoke County police responded to the disturbance at Smallwood's house, Foley was standing in the middle of Holly Tree Road and pointing a gun at the approaching

marked police vehicles.[1]  Although Foley was standing in the road beyond the entrance to his driveway, "he was standing right next to [his house]," about twenty feet away "[a]s a crow flies." Where Foley was standing, there is a steep slope between the road to his house.  After ordering Foley to drop his weapon and handcuffing him, the police officers searched Foley's person and found a loaded .25 caliber handgun in the pocket of his sweatpants.

Foley was charged with carrying a concealed weapon.  At his bench trial, Foley argued that he was not guilty because at the time of the offense he was standing on the curtilage of his residence—an exception expressly provided for by statute in Code § 18.2-308(B).[2]  The trial court rejected his argument, finding that "it [i]s pretty clear that the roadway that the defendant was standing on when this occurred was his property but it was subject to an [sic] nonexclusive easement, which I think excludes it from being considered part of the curtilage pertaining to his residence and consequently the exception language of the statute doesn't apply."  Accordingly, the trial court found Foley guilty of carrying a concealed weapon in violation of Code § 18.2-308(A).

## II. ANALYSIS

Subsection (A) of Code § 18.2-308 prohibits the carrying of concealed weapons. However, subsection (B) of Code § 18.2-308 provides that "[t]his section shall not apply to any person while in his own place of abode *or the curtilage thereof*."  Foley concedes that he was carrying a concealed weapon, but argues that the trial court erred in finding that he was not

---

[1] Foley was charged with felony assault on a law enforcement officer, but was later acquitted by the trial court.

[2] Foley's trial counsel improperly argued that the Commonwealth bears the burden of proving "beyond a reasonable doubt . . . that he wasn't on his curtilage."  As discussed *infra* Part II.B, we hold that the exception provided in Code § 18.2-308(B) is a statutory defense that the accused bears the burden of production, and therefore the inapplicability of any statutory exception is not an essential element of the crime that the Commonwealth is required to prove beyond a reasonable doubt.

within the "curtilage" of his place of abode within the meaning of subsection (B) and consequently not exempt from prosecution under subsection (A). A trial court's "interpretation of a statute[] presents a question of law that we review *de novo*." LaCava v. Commonwealth, 283 Va. 465, 470, 722 S.E.2d 838, 840 (2012). Thus, in this case, we review the trial court's interpretation of the term "curtilage" contained in Code § 18.2-308(B) *de novo*.

### A. The Term "Curtilage," as Contained in Code § 18.2-308(B), Is as Defined at Common Law.

In accordance with the basic tenets of statutory construction, "[w]hen the language of a statute is plain and unambiguous, we are bound by the plain meaning of that language." Vaughn, Inc. v. Beck, 262 Va. 673, 677, 554 S.E.2d 88, 90 (2001). "Thus, '[a]n undefined term must be given its ordinary meaning, given the context in which it is used.'" Meeks v. Commonwealth, 274 Va. 798, 802, 651 S.E.2d 637, 639 (2007) (quoting Sansom v. Bd. of Supervisors, 257 Va. 589, 594-95, 514 S.E.2d 345, 349 (1999)). "[W]hen the General Assembly has used words of a plain and definite import, courts cannot place on them a construction that amounts to holding that the General Assembly meant something other than that which it actually expressed." Vaughn, Inc., 262 Va. at 677, 554 S.E.2d at 90. "Consequently, '[t]he plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction.'" Meeks, 274 Va. at 802, 651 S.E.2d at 639 (quoting Commonwealth v. Zamani, 256 Va. 391, 395, 507 S.E.2d 608, 609 (1998)).

Both the Commonwealth and Foley agree that the Code does not define "curtilage" and there is no existing Virginia case law construing the meaning of "curtilage" as it is used in Code § 18.2-308(B), or as it is used elsewhere in the Code.[3] Although the Code does not expressly

---

[3] There are three additional places where the term "curtilage" appears in the Code: Code § 18.2-308.2 allows a convicted felon to possess a stun gun "in his residence or the curtilage thereof"; Code § 64.2-307 allows a surviving spouse to "enjoy the principal family residence and curtilage without charge for rent, repairs, taxes, or insurance"; and finally, Code § 18.2-78 limits

- 4 -

define "curtilage," because the term's plain meaning is well established at common law, we assume the General Assembly intended to assign its established meaning. See Meeks, 274 Va. at 802, 651 S.E.2d at 639 (finding that when courts interpret the language of a statute, "'[a]n undefined term must be given its ordinary meaning, given the context in which it is used'" (quoting Sansom, 257 Va. at 594-95, 514 S.E.2d at 349)); see also Code § 1-200 ("The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly.").

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." United States v. Dunn, 480 U.S. 294, 300 (1987). The Supreme Court of Virginia explained in Bare v. Commonwealth, 122 Va. 783, 794, 94 S.E. 168, 172 (1917), that "[i]n England the curtilage seems to have included only the buildings within the inner fence or yard, because there, in early times, for defense, the custom was to enclose such place with a substantial wall," however, in the United States "such walls or fences, in many cases, do not exist, so that [in the United States] the curtilage includes the cluster of buildings constituting the habitation or dwelling place, whether enclosed with an inner fence or not." The Bare Court defined a home's "curtilage" as "a space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the yard, garden or field which is near to and used in connection with the dwelling." Id.

Bare's definition embodies the common law conception of the meaning of "curtilage": the boundaries of a home's curtilage are primarily defined by *their relationship with the home*

---

what is deemed a "dwelling house"—excluding certain structures despite being "within the curtilage thereof." Presently, no Virginia appellate court has construed the term "curtilage" in relation to any of these statutes.

*itself* rather than mere physical proximity or ownership.  See Oliver v. United States, 466 U.S. 170, 180 (1984) ("At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" (quoting Boyd v. United States, 116 U.S. 616, 630 (1886))).  Thus, regardless of the context in which the extent of a home's "curtilage" arises, the shared inquiry is the relevant area's connection to the residence and its role in the lives of its occupants.[4]  See Robinson v. Commonwealth, 273 Va. 26, 34, 639 S.E.2d 217, 221 (2007) ("'[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.'" (quoting Dunn, 480 U.S. at 300)).  This is because the term "curtilage," as it is used in the legal context, is historically understood to refer to an extension of the home that is so intertwined with the home that the law must provide it the same protection as the home itself.  See Florida v. Jardines, 133 S. Ct. 1409, 1414-15 (2013) ("Just as the distinction between the home and the open fields is as old as the common law, so too is the identity of home and what Blackstone called the 'curtilage or homestall,' for the 'house protects and privileges all its branches and appurtenants.'" (quoting 4 William Blackstone, Commentaries *223, *225)); Jefferson v. Commonwealth, 27 Va. App. 1, 15 n.2, 497 S.E.2d 474, 481 n.2 (1998) ("The concept that the legal protections afforded to a dwelling house also extend to the curtilage originated at common law.").

Because "curtilage" is properly defined at common law by its relationship to the residence and its use by its occupants, we reject as erroneous the trial court's conclusion that

_____

[4] The appellate courts of the Commonwealth have applied Bare's definition of "curtilage" in numerous legal contexts.  See, e.g., Wellford v. Commonwealth, 227 Va. 297, 302, 315 S.E.2d 235, 238 (1984) (applying Bare in the Fourth Amendment context); Pettus v. Commonwealth, 123 Va. 806, 809, 96 S.E. 161, 162 (1918) (applying Bare in the prohibition law context); Kearney v. Commonwealth, 4 Va. App. 202, 204-05, 355 S.E.2d 897, 898 (1987) (discussing Bare in the Fourth Amendment context).

non-exclusive easements are per se excluded from being considered part of a home's curtilage within the meaning of this statute. While an area's use by third parties may be *relevant* in determining whether the area is in the home's curtilage, that fact alone does not categorically exclude it. Instead, courts must look to the area's use and connection to the home itself rather than its use by third parties.

Conversely, this Court also rejects Foley's argument that simply because he owned the property on which he was standing at the time of the offense, he was within the curtilage of his home and therefore exempt under subsection (B) from criminal prosecution under subsection (A). Such an interpretation of curtilage would deprive the courts of an inquiry into the particular use of the area in question and its relationship with the home. Moreover, if the General Assembly intended Code § 18.2-308(B) to exempt individuals standing on *any* portion of their property then it would not have chosen to use the more narrow terms "place of abode or the curtilage thereof." See Chandler v. Peninsula Light & Power Co., 152 Va. 903, 906, 147 S.E. 249, 250 (1929) ("Where the language used is clear but is not as broad as it might have been, the court cannot give to the words used a new meaning in order to make them include that which the letter of the law excludes.").

The Commonwealth urges this Court to apply the United States Supreme Court's four-factor test articulated in Dunn to determine the extent of a home's curtilage. The Dunn Court carefully noted that the factors were not intended to be a precise mathematical formula for determining the extent of a home's curtilage. Dunn, 480 U.S. at 301. Rather, the "factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. The four factors are: "[(1)] the proximity of the area claimed to be curtilage to the home, [(2)] whether

the area is included within an enclosure surrounding the home, [(3)] the nature of the uses to which the area is put, and [(4)] the steps taken by the resident to protect the area from observation by people passing by." Id.

"'It is a cardinal principle of law that penal statutes are to be construed strictly against the [Commonwealth]' and 'cannot be extended by implication, or be made to include cases which are not within the letter and spirit of the statute.'" Barnes v. Commonwealth, 61 Va. App. 495, 498, 737 S.E.2d 919, 921 (2013) (quoting Wade v. Commonwealth, 202 Va. 117, 122, 116 S.E.2d 99, 103 (1960)). Although the first three factors of Dunn's four-factor test are rooted in the common law origins of the term "curtilage," the "centrally relevant consideration" in determining the extent of the home's curtilage was whether the area should benefit from *Fourth Amendment* protections. Dunn, 480 U.S. at 301. Consequently, the Dunn Court added the fourth factor, which is only relevant in a Fourth Amendment context. Thus, Dunn and its progeny are a myriad of Fourth Amendment cases and represent factual and constitutional considerations that are not particularly relevant or applicable to a statutory interpretation of Code § 18.2-308.

Dunn's fourth consideration, "the steps taken by the resident to protect the area from observation by people passing by," while clearly relevant to any Fourth Amendment determination concerning a subjective expectation of privacy, it is not an essential component of the common law definition of "curtilage." Dunn and its progeny are best viewed as analytical tools for determining what *portion* of the overall curtilage of a home is afforded protection by the Fourth Amendment using the test announced in Katz v. United States, 389 U.S. 347 (1967). Because there is nothing to suggest that the General Assembly intended to impose a more restrictive definition of curtilage than that found in the common law, considering whether the accused protected the area from observation by people passing by in order to seek protection under Code § 18.2-308(B)'s exception would subject some individuals to criminal prosecution

whom the General Assembly clearly intended to statutorily exempt.[5] See, e.g., Harris v. Commonwealth, 274 Va. 409, 415, 650 S.E.2d 89, 91 (2007) (concluding that the Court was required to "construe Code § 18.2-308(A) strictly against the Commonwealth and to confine the statute to those offenses clearly proscribed by its plain terms," because it is "the role of the General Assembly, not th[e] Court, to craft any needed revisions to Code § 18.2-308(A) and to decide what items to include within the statute's proscription"). Because defendants "'[are] entitled to the benefit of any reasonable doubt about the construction of a penal statute,'" id., the law favors the common law's more inclusive definition of "curtilage," rather than Dunn's more exclusive four-factor test adopted for Fourth Amendment purposes.

Additionally, using the Dunn four-factor test in determining the boundaries of a home's curtilage is inconsistent with the General Assembly's use of the term in other sections of the Code. For example, Code § 64.2-307 allows a surviving spouse to "enjoy the principal family residence *and curtilage* without charge for rent, repairs, taxes, or insurance." (Emphasis added). If the Dunn factors were applicable outside of the Fourth Amendment context as the established method of determining the extent of a home's curtilage, a surviving spouse would not be entitled to those benefits in areas that he or she did not take steps to protect from observation—a result the General Assembly could not have intended. A more logical reading of the statute is that the

---

[5] There are foreseeable circumstances where Dunn's fourth factor would place an area squarely outside the reach of Fourth Amendment protections, notwithstanding the fact that a plain reading of the statute and the purpose behind subsection (B)'s curtilage exception demonstrates an obvious intent to exempt that area from prosecution under subsection (A)—for example, a front yard or an unfenced backyard. See, e.g., United States v. Vankesteren, 553 F.3d 286, 290 (4th Cir. 2009) (applying Dunn and finding that the "land must be classified as open fields and not curtilage" because, among other things, the defendant did not take steps to protect the area from observation as evidenced by the fact that "there was no indication that the interior fences were designed to keep people out"); United States v. Breza, 308 F.3d 430, 436 (4th Cir. 2002) (finding that the fourth Dunn factor weighed against a determination that the area was curtilage because "it d[id] not appear that [the defendant] made any additional effort to conceal the vegetable garden from public view").

General Assembly intended for the surviving spouse's benefits pertaining to principal residence to include those "necessary and convenient" areas that are "habitually used for family purposes and the carrying on of domestic employment." Bare, 122 Va. at 794, 94 S.E. at 172.

For the reasons stated above, we therefore hold that the common law definition of curtilage articulated in Bare is applicable to Code § 18.2-308(B) because it is consistent with a plain reading of the statute, the legislature's intent, and the well-established rules of statutory interpretation. Having determined the appropriate standard for determining the extent of a home's curtilage under Code § 18.2-308(B), we now turn to its applicability to the case at hand.

### B. Code § 18.2-308(B) Is a Statutory Defense.

The "bedrock of Virginia's criminal jurisprudence" is the fundamental precept that the Commonwealth bears the burden of proving every essential element of an offense beyond a reasonable doubt. Williams v. Commonwealth, 57 Va. App. 341, 351, 702 S.E.2d 260, 265 (2010). However, generally, it is the defendant that bears the burden of producing evidence in support of an affirmative defense. Id. In this case, Foley argued at the trial court below, and now argues on appeal, that in order to convict him of carrying a concealed weapon in violation of Code § 18.2-308(A) the Commonwealth was required to prove beyond a reasonable doubt that Foley was *not* on the curtilage of his abode at the time of the offense. The Commonwealth asserts on appeal that subsection (B) is a statutory defense and that Foley bore the burden of producing supporting evidence. The trial court did not expressly rule whether the exception language in Code § 18.2-308(B) was a statutory defense or an element of the crime, but simply concluded that because the area where Foley was standing was subject to a non-exclusive easement it was therefore excluded from being part of the curtilage and "the exception language of the statute doesn't apply." Therefore, in order to evaluate the sufficiency of the evidence in support of the trial court's judgment, we must first resolve whether subsection (B) is a statutory

defense to subsection (A) or, alternatively, a negative element of subsection (A). The resolution of this question will dictate whether Foley or the Commonwealth bore the burden of production on this point at trial.

When this Court "constru[es] penal statutes which contain qualifications, exceptions or exemptions to their application, the limiting language may be viewed as a negative element of the offense which the prosecution must disprove," or alternatively, as "a statutory defense, which the accused can assert to defeat the *prima facie* case of the prosecution." Mayhew v. Commonwealth, 20 Va. App. 484, 489, 458 S.E.2d 305, 307 (1995); see, e.g., Flanagan v. Commonwealth, 58 Va. App. 681, 699, 714 S.E.2d 212, 220 (2011) (finding that "the last clause of Code § 18.2-85 constitutes a statutory defense for which an accused bears the burden of providing the supporting evidence"). In determining whether specific limiting language is either an element of the offense or a statutory defense this Court considers four factors: (1) "'the wording of the exception and its role in relation to the other words in the statute;'" (2) "'whether in light of the situation prompting legislative action, the exception is essential to complete the general prohibition intended;'" (3) "'whether the exception makes an excuse or justification for what would otherwise be criminal conduct, i.e., sets forth an affirmative defense;'" and (4) "'whether the matter is peculiarly within the knowledge of the defendant.'" Flanagan, 58 Va. App. at 698, 714 S.E.2d at 220 (quoting Mayhew, 20 Va. App. at 489, 458 S.E.2d at 307).

Applying the Mayhew factors to Code § 18.2-308, it is clear that subsection (B) provides a statutory defense. First, the exception contained in subsection (B) which states that "[t]his section shall not apply to any person while in his own place of abode or the curtilage thereof," is in a separate paragraph following subsection (A) which sets forth the elements of the offense. Furthermore, subsection (B) is followed by subsections (C) and (D) which contain more than a dozen other exceptions where "this section shall not apply." Consequently, subsection (B) is not

- 11 -

essential to complete the general prohibition against carrying concealed weapons without a permit. In fact, "requiring the Commonwealth to prove this negative would undermine the general prohibition intended by the legislature" because the Commonwealth would be required to prove in the negative *all* the exceptions provided for in subsections (B)-(D). Williams, 57 Va. App. at 353, 702 S.E.2d at 265. If this Court were to adopt Foley's position, then in order to convict any defendant of carrying a concealed weapon, the Commonwealth in every such case would have to prove that none of the numerous exceptions found in the various subsections to Code § 18.2-308 applied, such as for example, that the defendant was *not* the "Harbormaster of the City of Hopewell." Code § 18.2-308(D)(5). Thirdly, subsection (B) excuses what would otherwise be criminal conduct under subsection (A), carrying a concealed weapon, if the accused acts "in his own place of abode or the curtilage thereof." Finally, whether the defendant was standing in an area habitually used for family purposes and the carrying on of domestic employment—and therefore within the curtilage of his home—requires evidence that is "'peculiarly within the knowledge of the defendant.'" Flanagan, 58 Va. App. at 698, 714 S.E.2d at 220 (quoting Mayhew, 20 Va. App. at 489, 458 S.E.2d at 307).

Consequently, the exception language in subsection (B) is not a negative element of the offense, but rather an affirmative defense. However, as this Court previously noted in Tart v. Commonwealth, 52 Va. App. 272, 276 n.2, 663 S.E.2d 113, 115 n.2 (2008), there is no uniform rule in Virginia regarding the burden of persuasion for affirmative defenses. "Instead, the determination of which party has the burden of persuasion turns on which affirmative defense is being asserted." Id. Compare Simopolous v. Commonwealth, 221 Va. 1059, 1069, 277 S.E.2d 194, 200 (1981) (holding that a defendant charged with a violation of Virginia's abortion regulation must "invoke[]" the affirmative defense of medical necessity, but that the Commonwealth "has the burden of negating [the defense] beyond a reasonable doubt[]"), aff'd,

- 12 -

462 U.S. 506, 510 (1983), with McGee v. Commonwealth, 219 Va. 560, 561, 248 S.E.2d 808, 809 (1978) (rejecting the appellant's argument that she was entitled to a jury instruction stating that the Commonwealth "ha[d] the burden of disproving beyond all reasonable doubt [her] affirmative plea of self-defense").

Here, given the number and nature of the statutory exceptions found in Code § 18.2-308, we hold that Foley was required to satisfy his burden of persuasion by pointing to evidence presented by the Commonwealth or presenting evidence on his own behalf sufficient to allow him to invoke a statutory exception. In the context of the exception Foley claimed was applicable in this case, he needed to point to or produce evidence that at the time of the offense he was standing in a "necessary and convenient" area that was "habitually used for family purposes and the carrying on of domestic employment." However, viewing the facts in the light most favorable to the Commonwealth, Foley failed to establish that he was standing on anything more than just property he owned. The record contains insufficient evidence that the section of Holly Tree Road where Foley was standing at the time of the offense was "habitually used for family purposes" or "the carrying on of domestic employment." Although Foley was only twenty feet away from his house, there was a steep slope between his location in the road and his home. While Holly Tree Road bisects Foley's property, there is no evidence in the record that he used either the road itself or the property on the other side of the road for anything but storing his farming equipment or as a "junk yard." In short, no evidence was presented that Foley used the portion of his property where he was arrested as an extension of the home to the degree that the law provides it the same protection as the home itself. We therefore conclude that the evidence in the record supports a finding that Foley failed to produce evidence that he was on the curtilage of his home at the time of the offense, and as a result, could avail himself of the statutory exception contained in Code § 18.2-308(B).

## III. CONCLUSION

In light of the foregoing, although it applied the wrong reasoning, the trial court did not err when it concluded that the statutory exception contained in Code § 18.2-308(B) did not apply, and we therefore affirm Foley's conviction for carrying a concealed weapon in violation of Code § 18.2-308(A).

Affirmed.