COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Huff and AtLee
Argued by videoconference

**PUBLISHED**

AKEEM ALEE CALOKOH

OPINION BY
v.      Record No. 0226-22-4          JUDGE RICHARD Y. ATLEE, JR.
FEBRUARY 28, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

Corinne J. Magee (The Magee Law Firm, on brief), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Appellant Akeem Alee Calokoh appeals his convictions for rape, in violation of Code

§ 18.2-61, and sexual penetration with an animate object, in violation of Code § 18.2-67.2.

Calokoh argues that the trial court erred by refusing to admit his school records. He also argues

that the trial court erred by ruling that Code § 19.2-271.6 did not permit the jury to consider his

intellectual disability when considering whether he "knowingly and intentionally had intercourse

with the complaining witness against her will, and without her consent." For the following

reasons, we disagree and affirm.

I. BACKGROUND

"On appeal of criminal convictions, we view the facts in the light most favorable to the

Commonwealth, and [we] draw all reasonable inferences from those facts." *Johnson v.

Commonwealth*, 73 Va. App. 393, 396 (2021) (alteration in original) (quoting *Payne v.

Commonwealth*, 65 Va. App. 194, 198 (2015)). So viewed, the facts are as follows.

In 2018, S.F., a woman from Martinsburg, West Virginia, met Calokoh on a dating app called "Scout." The pair exchanged phone numbers, and they spoke on the phone and texted prior to meeting in person. During their first text conversation, Calokoh asked S.F. if she wanted to "chill" and said she could spend the night with him. S.F. asked Calokoh if he was "just trying to hook up" and told him that it was not going to happen. Calokoh suggested they meet the following day, and they made plans to go out to eat and see a movie.

The following morning, S.F. drove from West Virginia to Fairfax County, Virginia. When she arrived, Calokoh asked her if she would take him to get cigarettes. She agreed and drove to the store. After Calokoh got the cigarettes, he offered to drive, and S.F. agreed and got into the passenger seat. Her car had a disabled parking placard, and while in the car, they discussed S.F.'s mobility issues. S.F. explained that she had "drop foot," a condition caused by nerve damage, where her foot would "just drop whenever it wants to drop" causing her to trip and fall, meaning she could not walk fast or run.

Calokoh did not drive back to his house; instead, he drove to a nearby neighborhood and parked the car across from a row of townhouses. Calokoh wanted to smoke weed, so he "rolled his blunt" in the car and started smoking. They sat in the car talking for over half an hour about their kids, the death of S.F.'s son's father, and previous relationships. S.F. mentioned that her son's father got turned on just by her kissing his neck. Calokoh then tried to grab S.F.'s breasts, but she told him "[n]o" and "pushed his hand away." When he tried to kiss her, she backed away. According to her, "she didn't think much of it" because they were both laughing and Calokoh stopped when asked.

Because Calokoh did not want to be seen smoking weed in public, they got out of the car and walked down a path to a green utility box. After about fifteen minutes, Calokoh started walking around the townhouses, and S.F. followed him. As they were walking, he asked if she

could run, and she replied, "Like what the fuck do you mean can I run? No. I have drop foot." When they got to the secluded path behind the townhouses, Calokoh grabbed her hand, placed it on his crotch, and said "[s]uck it please." S.F. laughed and said no. When he asked a few more times, she turned to walk away. Calokoh slammed her against the fence and tried to put his hand in her pants. She asked him to stop. He shoved her against the fence, which scratched the side of her face, snagged her shirt, and "ripped" her earring out of her ear. She was screaming and asking him to stop. Despite her struggles, Calokoh managed to get her pants down, and he put his fingers inside her vagina. He then removed his fingers and inserted his penis. At this point, she "couldn't get back away," and she "just closed [her] eyes and prayed for it to end."

When Calokoh was finished, S.F. pulled her pants up and walked away. He followed and told her, "You're going to be mine." When they got back to the car, she drove him to his apartment. He told her to wait while he checked on his son and then they would go to the movies. But when he went inside, she left. She drove to the nearest gas station, where she tried to call a couple of people who did not answer. A friend called her back and urged her to call the police. She drove to a second gas station and went to the bathroom, where she discovered the scratches on her face, her torn shirt, and bleeding ear. She then called 911. The police responded, and an officer took her to the hospital.

After the incident, Calokoh texted S.F., asking her where she was and telling her to "[c]ome back." He also texted, "Let['s] fuck again" and "Did u like my dick deep in u." When Detective Sean Cheetham of the Fairfax County Police Department arrived, he asked S.F. if she would be willing to participate in a controlled call with Calokoh. She agreed, but when she called Calokoh and confronted him about what happened, he ultimately hung up on her.

A different detective from the Fairfax County Police Department went to the scene to investigate. In the dirt near the fence, he discovered a gold hoop earring, which matched S.F.'s

remaining earring. A sexual assault nurse examiner conducted a physical examination of S.F. The nurse examiner observed that S.F.'s shirt was snagged, she had dried blood on her right ear lobe, and an abrasion on the side of her face. The nurse examiner also swabbed S.F.'s lips, breasts, thighs, external genitalia, vagina, and buttocks to collect DNA evidence. Subsequently, a forensic scientist found sperm in the samples recovered from S.F.'s external genitalia, vagina, and buttocks. A DNA profile was also developed from the sample taken from S.F.'s breast. At trial, the forensic scientist testified that Calokoh could not be eliminated as a contributor to the sperm or the DNA profile.

Detective Cheetham interviewed Calokoh. Initially, Calokoh denied anything happened and claimed S.F. left when the timing did not work out to go to the movies. He told multiple different stories about what happened in the car, from denying anything happened to claiming that S.F. tried to touch him. He denied having sex with S.F. and any possibility of his DNA being found on S.F.

At trial, Calokoh's mother, Fatima Jahami, testified on his behalf. She explained that her son had "learning issues," which she noticed when he was "about three." Once he started school, he was in special education classes, and he had an independent educational plan ("IEP"). Calokoh sought to introduce his school records into evidence. The Commonwealth objected, arguing that the records were not relevant to whether he had the intent to rape S.F. at the time of the offense. The trial court sustained the objection. Jahami also testified that she taught her son not to talk to the police, and she explained that when he is scared, he "just says anything at that moment."

Calokoh testified in his own defense. His explanation of the first part of their meeting largely mirrored S.F.'s version. In the car, however, he claimed that S.F. was kissing his neck and "pulling on [his] private parts." In his account, S.F. asked if he knew where they could find

a private spot to "do it." At this point, they got out of the car, and after he finished smoking his joint by the utility box, they walked down the path behind the townhouses. Calokoh admitted that he had sex with S.F., but he denied that S.F. screamed, told him no, or pushed him away. When they were finished, Calokoh claimed that S.F. asked him for $80, which he refused. He explained that they went back to his house so he could check on his son, and when he looked outside, S.F. had left.

Calokoh's last witness was Dr. Michael Hendricks, a forensic psychologist. The Commonwealth objected to his testimony. It argued that Calokoh was attempting to negate intent with the new diminished capacity statute in Code § 19.2-271.6 and that Dr. Hendricks had never evaluated Calokoh's intent at the time of the offense.[1] The trial court ultimately allowed the expert to testify "with regard to the very narrow question of whether the defendant knowingly and intentionally committed the acts constituting the elements of rape."

Dr. Hendricks testified that he reviewed Calokoh's school records, including psychological evaluations and IEPs. Calokoh again tried to introduce the school records. The Commonwealth objected; it argued that the records contained a lot of irrelevant information and that a lot of it would be hearsay. Calokoh argued that he had to show the mental condition existed "prior to his being age 18" and the records had to come in because they were part of the basis for the expert's opinion. The trial court refused to admit the documents, but it allowed Dr. Hendricks to testify "to whatever he relied on that relates specifically to whether the defendant had an intellectual disability." It concluded that "[e]verything else is irrelevant."

Dr. Hendricks testified that it was his opinion that Calokoh had an intellectual disability, one established very clearly during his school years. When asked what documents he relied

---

[1] The Commonwealth also argued that Code § 19.2-271.6 did not apply to general intent crimes, such as rape. It does not make that argument on appeal.

upon, he explained that he relied on evaluations with IQ testing or achievement testing, but he "didn't rely so much specifically on the IEPs. The IEPs are simply what happens after you demonstrated that someone has an intellectual disability." Dr. Hendricks explained the difficulties someone with an intellectual disability may face. He explained that someone like Calokoh would be able to follow "clear and concrete" messages, but that he would struggle with mixed messaging. He explained that Calokoh would not be able to navigate mixed messages, or something like someone changing their mind, in a social situation.

At the conclusion of the evidence, the parties discussed the jury instructions with the trial court. Calokoh argued that Code § 19.2-271.6 created a new affirmative defense, and he argued that in addition to the other elements, the Commonwealth had to prove that Calokoh "knowingly and intentionally" acted against the victim's will and without her consent. He asked that the words "knowingly and intentionally" be inserted into the model jury instructions for rape and animate object sexual penetration. The Commonwealth objected, both to alteration of model instructions and because "knowingly and intentionally" applied only to the act of having sex, not the consent aspect. The trial court ruled that it did not want to amend the model instructions, but it would give a separate instruction to deal with the new Code § 19.2-271.6.

Calokoh offered three new instructions: I, J, and K. Instruction I provided, "The Court instructs the jury that the Commonwealth must prove that the Defendant committed the elements of rape and animate object sexual penetration knowingly and intentionally." Instruction J provided, "The Court instructs the jury that if you have a reasonable doubt as to whether the defendant knowingly and intentionally had sexual intercourse with [S.F.] against her will and without her consent, by force, threat or intimidation, you shall find the defendant not guilty." Instruction K stated, "The Court instructs the jury that if you have a reasonable doubt as to whether the defendant knowingly and intentionally penetrated the outer lips of the female sexual

- 6 -

organ of [S.F.] against her will and without her consent, by force, threat or intimidation, you shall find the defendant not guilty." The trial court refused to grant these instructions.

Instead, the trial court granted Commonwealth's Instructions 19 and 20, which stated, "You may consider evidence of defendant's mental condition if it tends to show the defendant did not have the requisite intent at the time of offense. Intent is established upon proof that the accused knowingly and intentionally committed the acts constituting elements one (1) and three (3)" of rape (Instruction 19) and object sexual penetration (Instruction 20).[2] Calokoh objected to these instructions, arguing that "knowingly and intentionally" applied to all three elements, including the second element, which is whether the victim consented. In overruling Calokoh's objection to those instructions, the trial court stated,

> Element 2 is consent. You can certainly argue that factually they should believe him and not her and that she did not consent. But the issue about whether his intellectual disability is a defense really only goes to, it says the act. And then the only acts that are mentioned here are 1 and 3.

Once the jury instructions were finalized, the trial court instructed the jury, and the parties gave their closing arguments. On the second day of deliberations, the jury sent the trial court a question. It read, "Reading instruction #19, in relation to instruction #10, can the Court clarify whether or not we may consider the Defendant's intellectual disability in relation to the #2 element of the rape charge (ie: whether he believed she had consented)?" After discussion with the parties, and over Calokoh's continuing objection, the trial court responded, "No, you may not consider Defendant's intellectual disability in relation to element #2." Ultimately, the

---

[2] Element one of rape is that the defendant had sexual intercourse with the victim. Element one of object sexual penetration is that the defendant penetrated the outer lips of the female sexual organ with any animate object. The third element of both is that the sexual contact was accomplished by force, threat, or intimidation. *See* Code § 18.2-61 (rape); Code § 18.2-67.2 (object sexual penetration).

jury convicted Calokoh of both rape and animate object sexual penetration.  He now appeals those convictions.

## II. ANALYSIS

### A. Code § 19.2-271.6

Calokoh argues that newly enacted Code § 19.2-271.6 creates an affirmative defense, allowing him to present evidence of an intellectual disability to challenge whether he had the intent necessary to commit the offenses charged.  He also argues that Code § 19.2-271.6 supersedes prior decisions by both the Supreme Court and this Court and allows the jury to consider a defendant's intellectual disability as it relates to *all* elements of the offense for which he was charged, including whether the victim consented to the sexual intercourse.  Based on this argument, Calokoh contends that the trial court erred by denying his proposed jury Instructions I, J, and K; by granting Instructions 19 and 20; and "by responding to the jury's question that they could not consider [Calokoh's] intellectual disability with respect to the complaining witness's unwillingness or lack of consent."  For the following reasons, we disagree.

### 1. *Standard of Review*

"As a general rule, the decision to grant or deny proffered instructions rests within the sound discretion of the trial court."  *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014).  "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo."  *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).  To the extent we review the trial court's statutory interpretation of Code § 19.2-271.6, we review it de novo.  *Brothers v. Commonwealth*, 50 Va. App. 468, 473 (2007).  Additionally, "[a] judicial response to a jury question is considered a legal instruction."  *Ludwig v. Commonwealth*, 52 Va. App. 1, 11 (2008).  Thus, we review the

trial court's response to the jury's question under the same standard as we review the decision to grant jury instructions. *Id.*

2. *Code § 19.2-271.6 did not create an affirmative defense. It is an evidentiary rule that abrogated the common law.*

Code § 19.2-271.6 went into effect on July 1, 2021. It provides,

> evidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense, including expert testimony, is relevant, is not evidence concerning an ultimate issue of fact, and shall be admitted if such evidence (i) tends to show the defendant did not have the intent required for the offense charged and (ii) is otherwise admissible pursuant to the general rules of evidence.

Code § 19.2-271.6(B). To establish such a mental condition,

> the defendant must show that his condition existed at the time of the offense and that the condition satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.

*Id.* Calokoh argues that Code § 19.2-271.6 creates an affirmative defense relating to intent, "requiring the Defendant to go forward with evidence of that disability to show that he did not knowingly and intentionally commit any of the elements of those offenses." We disagree.

It is well-established that "the burden is on the Commonwealth to prove every essential element of the offense beyond a reasonable doubt." *Williams v. Commonwealth*, 57 Va. App. 341, 351 (2010) (quoting *Bishop v. Commonwealth*, 275 Va. 9, 12 (2008)). When it comes to defenses, however, there is an important distinction between "case-in-chief defenses" and affirmative defenses, the latter of which may place a burden of proof on the defendant. Ronald J. Bacigal & Corinna Barrett Lain, *Criminal Procedure* § 17:28 (2022-2023 ed.).

In a case-in-chief defense, the defendant "challenges the prosecution's ability to prove some essential element of the charged offense." *Id.* A common example of this is an alibi

defense. When a defendant puts forth an alibi, it is not an affirmative defense, "but . . . a denial of an essential element of the offense, i.e., presence at the scene of the crime." *Id.* at § 17:32. With these types of defenses, the burden of proof remains on the prosecution, and the defendant need only offer enough evidence (e.g., of an alibi) to create a reasonable doubt as to guilt. *Marlow v. Commonwealth*, 2 Va. App. 619, 624 (1986); *see also* Bacigal & Lain, *supra*, § 17:32.

"'An affirmative defense,' however, raises 'a separate issue which may carry a separate burden of proof.'" *Williams*, 57 Va. App. at 352 (quoting Ronald J. Bacigal, *Criminal Procedure* § 17:28 (2007-2008 ed.)). The defendant carries the burden to produce evidence to establish his affirmative defense. *Tart v. Commonwealth*, 52 Va. App. 272, 276 (2008). Self-defense is an example of an affirmative defense. The "defendant implicitly admits the killing was intentional and assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors." *Commonwealth v. Cary*, 271 Va. 87, 99 (2006) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). Affirmative defenses often "make[] an excuse or justification for what would otherwise be criminal conduct." *Foley v. Commonwealth*, 63 Va. App. 186, 200 (2014) (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 698 (2011)).

Code § 19.2-271.6 makes evidence of a defendant's mental condition relevant if it "tends to show the defendant did not have the intent required for the offense charged" and it "is otherwise admissible pursuant to the general rules of evidence." The statute also sets out what the defendant must show to "establish the underlying mental condition." Code § 19.2-271.6(B). But unlike an affirmative defense, Code § 19.2-271.6 does not provide individuals with a qualifying mental condition "an excuse or justification for what would otherwise be criminal conduct." *Foley*, 63 Va. App. at 200 (finding Code § 18.2-308 creates an affirmative defense to carrying a concealed weapon by exempting an accused acting "in his own place of abode or the

curtilage thereof" (quoting *Flanagan*, 58 Va. App. at 698)). The mental condition in Code § 19.2-271.6 is more akin to the alibi case-in-chief defense. Presenting evidence of a qualifying mental condition is not an excuse or justification, but rather "a denial of an essential element of the offense." Bacigal & Lain, *supra*, § 17:32. Under Code § 19.2-271.6(B), the defendant is denying that he had the "intent required for the offense charged." The burden of proof is still on the Commonwealth to prove the defendant's guilt beyond all reasonable doubt, with the defendant's mental condition making up part of the evidence that the factfinder considers. Consequently, Code § 19.2-271.6 does not create a new affirmative defense. *See Temple v. Commonwealth*, No. 1172-21-1 (Va. Ct. App. Oct. 4, 2022) (coming to the same conclusion).[3]

Instead, Code § 19.2-271.6 is an evidentiary rule that abrogates the common law. Prior to the passage of Code § 19.2-271.6, Virginia adhered to the common law rule, which meant that "evidence of a criminal defendant's mental state at the time of the offense [was], in the absence of an insanity defense, irrelevant to the issue of guilt." *Schmul v. Commonwealth*, 69 Va. App. 281, 300 (2018) (quoting *Stamper v. Commonwealth*, 228 Va. 707, 717 (1985)), *aff'd*, 298 Va. 131 (2019). Any person not deemed legally insane was "presumed to be sane, and to possess a sufficient degree of reason to be responsible for [their] crimes." *Id.* (alteration in original) (quoting *Stamper*, 228 Va. at 717). Thus, short of raising an insanity defense, a defendant was not permitted to present evidence of his or her mental state or diminished capacity to negate mens rea. *Stamper*, 228 Va. at 716-17 (declining to recognize diminished capacity as a defense).

The General Assembly, however, is permitted to alter the common law if it so chooses, Code § 1-200, which is exactly what it did with Code § 19.2-271.6. While the common law precluded all evidence of a defendant's mental state unless the defendant raised an insanity

---

[3] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Blowe v. Commonwealth*, 72 Va. App. 457, 468 n.10 (2020) (quoting *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012)).

defense, Code § 19.2-271.6 expressly changed that rule, and it allows evidence "of the defendant's mental condition at the time of the alleged offense"—even if it falls short of insanity—if it "tends to show the defendant did not have the intent required for the offense charged" and is otherwise admissible under the rules of evidence. Therefore, a defendant may now raise an insanity defense, or, short of that, satisfy the requirements of Code § 19.2-271.6. Thus, rather than create a new affirmative defense, Code § 19.2-271.6 permits defendants to introduce evidence of a mental condition that previously would not have been permitted under the common law.

3. *Code § 19.2-271.6 did not alter the elements of rape and animate object penetration.*

Calokoh also argues that Code § 19.2-271.6 "change[d] the ruling" in prior cases and "allows the jury to consider the intellectual disability with respect to all three elements of both . . . offense[s]," including whether the victim consented. We disagree.

Under Virginia law, a person is guilty of rape if he or she "has sexual intercourse with a complaining witness, whether or not his or her spouse . . . and such act is accomplished (i) against the complaining witness's will, by force, threat or intimidation of or against the complaining witness or another person." Code § 18.2-61(A). A person is guilty of animate object sexual penetration

> if he or she penetrates the labia majora or anus of a complaining witness, whether or not his or her spouse, other than for a bona fide medical purpose . . . and . . . [t]he act is accomplished against the will of the complaining witness, by force, threat or intimidation of or against the complaining witness or another person.

Code § 18.2-67.2(A)(2). Both offenses require that the prohibited act be done against the will or without the consent of the complaining witness.

Although proof of rape requires that the accused "knowingly and intentionally" committed the acts constituting rape, the Supreme Court has pointed out that "a defendant's

- 12 -

intent to commit the crime of rape is not the same issue as whether a victim consented to sexual intercourse. Those two issues are distinct and should not be blurred." *Commonwealth v. Minor*, 267 Va. 166, 173 (2004). "[T]he crime of rape does not require proof that the defendant harbor a specific intent to have intercourse without the victim's consent, only the general intent evidenced by the act of committing the offense itself." *Gonzales v. Commonwealth*, 45 Va. App. 375, 382 (2005) (en banc). "The lack of consent required for rape involves the victim's mental state, not the defendant's." *Id.* The same rules apply to object sexual penetration. *See Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002) ("Object sexual penetration may be analogized to the crime[] of rape (Code § 18.2-61) . . . [and t]herefore, cases interpretating [Code § 18.2-61] are useful in discerning the meaning and intent of Code § 18.2-67.2.").

Calokoh contends that Code § 19.2-271.6 supersedes *Minor* and *Gonzales* and allows the factfinder to consider the defendant's intellectual disability as it relates to the victim's consent. He contends that the statute means the Commonwealth must prove that he knowingly and intentionally acted without the victim's consent.

But nothing in the plain language of Code § 19.2-271.6 indicates an intent to change the elements of rape or any other criminal offense. *See City of Charlottesville v. Payne*, 299 Va. 515, 527 (2021) ("We consider the language of [the] statute at issue to determine the General Assembly's intent from the plain and natural meaning of the words used." (alteration in original) (quoting *Hoffman Fam., L.L.C. v. City of Alexandria*, 272 Va. 274, 284 (2006))).

Code § 19.2-271.6 provides that evidence of a defendant's mental condition at the time of the alleged offense is relevant if it "tends to show the defendant did not have the *intent required* for the offense charged." (Emphasis added). There is no indication that the General Assembly intended to alter or change the elements of rape or animate object penetration. Rather, the plain language generally refers to "the intent required for the offense charged," which indicates that

- 13 -

the General Assembly did not change the intent requirement for any offenses. Instead, it allowed a new form of evidence, which had previously been prohibited, to challenge the Commonwealth's evidence of intent. This is further supported by the fact that Code § 19.2-271.6 is a general statute, applying not just to rape or animate object sexual penetration, but to "any criminal case." Code § 19.2-271.6(B).

The purpose of Code § 19.2-271.6 is not to amend the intent element of any criminal offense, but rather, as discussed above, to abrogate the common law rule that prohibited evidence of a defendant's mental condition short of legal insanity. Because Code § 19.2-271.6 does not create an affirmative defense and did not amend the elements of rape or animate object penetration, the trial court did not err when it denied Calokoh's proffered jury instructions and granted the Commonwealth's instructions. Nor did it err when it answered the jury question by telling the jury that the evidence of Calokoh's mental condition could not be considered in relation to whether the victim consented.

## B.  Admissibility of Calokoh's school records

Calokoh argues that the trial court erred by refusing to admit into evidence his school records, which included psychological evaluations and Calokoh's IEPs. We review "the circuit court's decisions regarding the admissibility of evidence for abuse of discretion." *Jones v. Commonwealth*, 71 Va. App. 70, 85 (2019). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Kenner v. Commonwealth*, 71 Va. App. 279, 289 (2019) (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)), *aff'd*, 299 Va. 414 (2021).

Calokoh relies on *Simpson v. Commonwealth*, 227 Va. 557 (1984), and Virginia Rule of Evidence 2:703 to argue that the school records should have been admitted because his expert

relied on them to establish that Calokoh had an intellectual disability and that it occurred prior to the age of eighteen, which was necessary under Code § 19.2-271.6.[4]

In *Simpson*, the Supreme Court recognized that an expert witness in a criminal case in Virginia generally is not permitted to base his or her opinion on facts not in evidence, and it refused to adopt a rule that would allow experts to do so. 227 Va. at 565. Under Rule 2:703, an expert witness's testimony in a criminal case is admissible "if it is based upon facts personally known or observed by the expert, *or based upon facts in evidence*." (Emphasis added). Because Calokoh's expert relied on the school records, he contends that the records themselves should have been admitted into evidence.

But this situation is the inverse of the situation addressed by the Court in *Simpson*. Both the case and rule cited by Calokoh govern the admissibility of the *expert witness's testimony*, not the admissibility of the evidence upon which the expert relies. Here, it is the admissibility of the *documents* that are at issue—not the admissibility of the expert's testimony. Calokoh's expert, Dr. Hendricks, was permitted to testify. While an expert witness must base his or her testimony upon facts in evidence, the expert's reliance on or review of certain facts or documents does not

---

[4] To establish a mental condition under Code § 19.2-271.6(B), a defendant must show that the condition existed at the time of the offense and that the condition "satisfies the diagnostic criteria for . . . (ii) a developmental disability or intellectual disability." Code § 19.2-271.6(A) defines "Intellectual disability" by reference to the definition in Code § 37.2-100, which defines it as

> a disability, originating before the age of 18 years, characterized concurrently by (i) significant subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning, administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.

Code § 37.2-100.

automatically render those facts or documents admissible evidence. The evidence relied upon must be admissible under the rules of evidence.

The trial court concluded that large portions of the school records were not relevant. Relevant evidence is "evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. Beyond arguing that the documents were admissible because the expert relied on them, Calokoh's single argument addressing the relevance of the documents is that he was required to show that the intellectual disability occurred prior to age eighteen. But this argument does not address the trial court's ruling that large portions of the record were not relevant to whether Calokoh had a disability. And even Dr. Hendricks' testimony confirmed that portions of the school record were not relevant, as he testified that he "didn't rely so much specifically on the IEPs. The IEPs are simply what happens after you demonstrated that someone has an intellectual disability."

Furthermore, the trial court permitted Dr. Hendricks to testify about the portions of the record that he relied on that related to whether Calokoh had an intellectual disability. And it also permitted him to testify about how that disability may have impacted Calokoh's decision making during the incident with S.F. Calokoh's arguments to this Court focused on the admissibility of expert testimony, which was not at issue. He did not otherwise address the relevance issues of the school records. Therefore, the trial court did not abuse its discretion by refusing to admit the school records into evidence.

### III. CONCLUSION

For the foregoing reasons, we affirm Calokoh's convictions.

*Affirmed.*