COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Chief Judge Decker, Judges Beales and Athey
Argued at Richmond, Virginia


COMMONWEALTH OF VIRGINIA, *ex rel.*
 JOSHUA M. HARMAN

v.     Record No. 1264-24-2

TRINITY INDUSTRIES, INC., ET AL.

MEMORANDUM OPINION[*] BY
JUDGE RANDOLPH A. BEALES
MARCH 31, 2026

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Bradley B. Cavedo, Judge

Walter D. Kelley, Jr. (Renner Walker; Wyatt B. Durette, Jr.; Kevin J. Funk; Thomas Oakes; Kelley Legal, PLLC; Hausfeld, LLP; Durrette, Arkema, Gerson & Gill PC; The Oakes Firm LLC, on briefs), for appellant.[1]

Bradley G. Hubbard (Matthew B. Kirsner; Cody T. Murphey; Elizabeth D. Scott; Michael A. Montgomery; Annemarie DiNardo Cleary; Allyson N. Ho; John C. Fitzpatrick; Anthony F. Troy; Williams Mullen; Akin Gump Strauss Hauer & Feld LLP; Eckert Seamans Cherin & Mellott, LLC; Gibson, Dunn & Crutcher LLP; Bartlit Beck LLP; The Stanley Law Group, PLLC, on brief), for appellees.

In 2013, Joshua M. Harman filed this *qui tam* action on behalf of the Commonwealth of

Virginia against Trinity Industries, Inc. and Trinity Highway Products, LLC, alleging that Trinity

had violated the Virginia Fraud Against Taxpayers Act ("VFATA"). In 2024, the Circuit Court

of the City of Richmond granted Trinity's motion for summary judgment and denied Harman's

motion for reconsideration. On appeal, Harman contends that the circuit court erred because

disputed issues of material fact existed about whether Trinity knowingly made materially false

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Commonwealth is not a party to this appeal.

statements by failing to disclose a design change to its guardrail end terminal system, the ET Plus.

## I. BACKGROUND[2]

The ET Plus is a guardrail end terminal system[3] manufactured and sold by Trinity. The design was developed by research engineers at Texas A&M Transportation Institute, which then licensed the design to Trinity.

The Federal Highway Administration ("FHWA") subsidizes many highway construction projects, and to be eligible for federal reimbursement, the FHWA requires all guardrail end terminal systems to be "crashworthy according to the guidelines in Report 350." Report 350 is published by the National Cooperative Highway Research Program ("NCHRP") and "contains recommended procedures for evaluating the safety performance of various highway safety features," including guardrail end terminal systems. After products are subjected to crash testing, FHWA reviews the results of those tests and then "issues acceptance letters to developers of crashworthy hardware."

The Virginia Department of Transportation contracts with third parties to execute construction projects on Virginia highways, including the installation of guardrail end terminal systems. VDOT requires that any guardrail end terminal systems installed on Virginia highways be Report 350-compliant. However, VDOT also conducts its own "standardized approval process" where it reviews the results of Report 350-compliant testing, but VDOT does not

---

[2] "In reviewing the circuit court's decision to sustain the defendants' motion for summary judgment, we review those specific portions of the record in the light most favorable to the nonmoving party." *Jackson v. Hartig*, 274 Va. 219, 229 (2007). Here, that party is Harman.

[3] A guardrail end terminal is "designed to minimize injury to motorists and occupants of their vehicles, as well as their vehicles coming into head-on contact with a guardrail end." Upon impact, it "absorbs most of the energy of the collision, brings about a safe deceleration of the vehicle following impact, prevents the guardrail from penetrating the vehicle[,] and maintains the vehicle in an upright position."

require additional retesting of a product if that product has already passed Report 350 crashworthy tests. "Before a particular end terminal system can be installed in Virginia, the system's design must be submitted to VDOT, approved by that agency and placed on VDOT's Approved Products List."

In 2000, the FHWA approved the ET Plus as Report 350-compliant. VDOT then put the ET Plus on the Approved Products List. In 2005, according to Harman, Trinity engaged in a "secret product substitution scheme" by changing the design of the ET Plus, "reducing the width of the feeder chute from five to four inches." Harman alleges that Trinity made the design change to save money. Trinity admits that the design change saved them money but argues that it made the changes to be compatible with newer, taller guardrails that states had begun installing. Trinity continued using the same name and product number for the 4-inch model as it had used for the 5-inch model. It is the 4-inch ET Plus at issue in this appeal.

In 2005, engineers at Texas A&M crash tested the 4-inch ET Plus and submitted a report to the FHWA. The FHWA subsequently approved the 4-inch ET Plus as eligible for federal reimbursement. Crucially, the FHWA did not require manufacturers to disclose all changes made to highway products. Report 350 itself stated:

> It is not uncommon for a designer/tester to make design changes to a feature during the course of conducting the recommended test series or after successful completion of the test series. Changes are often made to improve performance or to reduce cost of the design or both. Questions then invariably arise as to the need to repeat any or all of the recommended tests. Good engineering judgment must be used in such instances. As a general rule, a test should be repeated if there is a reasonable uncertainty regarding the effect the change will have on the test.

Between 2005 and 2014, contractors installed thousands of 4-inch ET Plus units on Virginia highways. Every time Trinity delivered a 4-inch ET Plus end terminal to VDOT's contractors for installation, it attached a "Certificate Of Compliance For Trinity Industries, Inc.,"

certifying that the product was an "E.T. PLUS EXTRUDER TERMINAL" and that it was "NCHRP Report 350 Compliant." The certificates were signed by a member of Trinity's Quality Assurance team and notarized.

In 2012, Harman, a competitor of Trinity, notified the FHWA of Trinity's alleged "secret product substitution scheme." After an investigation, the FHWA confirmed that the version tested and subsequently approved in 2005 was the 4-inch design. In 2014, the FHWA issued a formal memorandum, confirming that the 4-inch ET Plus had "[a]n unbroken chain of eligibility for Federal-aid reimbursement" and that it "continues to be eligible today."

Harman also notified several state departments of transportation, including VDOT. VDOT conducted its own investigation and concluded that the 4-inch ET Plus "is a different product than that approved by VDOT for use on Virginia roadways in 2000" and that it had "not been approved for use in Virginia by VDOT." VDOT then changed the Approved Products List to specify that only the 5-inch ET Plus was approved for use on Virginia highways.

In 2013, Harman initiated this *qui tam* action on behalf of the Commonwealth against Trinity in the circuit court. Harman filed similar lawsuits in California, Delaware, Florida, Georgia, Illinois, Iowa, Minnesota, Montana, Nevada, New Jersey, Rhode Island, and Tennessee. He also filed against Trinity in federal court. *See U.S. ex rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645 (5th Cir. 2017), *cert. denied*, 586 U.S. 1067 (2019). His complaint alleged that Trinity had violated VFATA because "Trinity and its agents and employees knowingly made, used or presented and/or caused claims to be made, used or presented to VDOT by presenting or causing to be presented invoices or other statements containing false and fraudulent claims for payment." The Commonwealth intervened in the lawsuit in 2014.

In 2016, the circuit court stayed the matter pending the resolution of Harman's federal case against Trinity. In 2020, the Commonwealth filed an amended complaint, and in 2021, the

stay was lifted.  In 2023, Trinity moved for summary judgment, arguing that Harman had not presented a "genuine dispute of fact as to at least three essential elements" of his VFATA claim.

On February 7, 2024, after a hearing, the circuit court entered an order simply entitled, "Order," stating, "The Court hereby GRANTS Defendants' Motion for Summary Judgment.  It is ORDERED that the trial dates and hearing dates for this matter be removed from the Court's docket.  A memorandum opinion and final order dismissing the case will be forthcoming."

On March 11, 2024, the circuit court issued a "Memorandum Opinion and Final Order," concluding that Trinity was correct that "Plaintiff has failed to meet its burden on each element of a claim under the Virginia Fraud Against Taxpayers Act."  The circuit court explained that Harman had not proven falsity, knowledge, or materiality.  First, with regard to falsity, the circuit court stated that Trinity did not make any false statements because "there was no Virginia Department of Transportation (VDOT) rule or regulation that required Trinity to disclose any modifications made to the ET Plus."  Next, with regard to knowledge, the circuit court held that the record was "devoid of any contract, regulation, guidance, rule or other form [or] direction that would have put the Defendants on notice that they were required to disclose to the Plaintiff that they had made changes to the ET Plus."  Finally, with regard to materiality, the circuit court stated that "the Commonwealth continued to purchase the ET Plus end terminals with full knowledge of Harman's claims about product changes and alleged deficiencies," and held that Harman had failed to prove that "any alleged regulatory non-compliance by Trinity was material to the Commonwealth's ultimate payment decision."

The March 11, 2024 memorandum opinion and order were not sent to counsel of record for the Commonwealth or Harman, so on March 20, 2024, they filed a joint motion to suspend the order, which the circuit court granted on March 26, 2024—within 21 days of the March 11, 2024 order while the matter was still within the jurisdiction of the circuit court.  In anticipation

of the filing of a motion for reconsideration, the circuit court suspended the March 11, 2024 order until it could rule on the motion for reconsideration. On April 16, 2024, after the circuit court had suspended its March 11, 2024 final order, the Commonwealth and Harman filed the anticipated joint motion for reconsideration. On July 11, 2024 (while the previous March 11, 2024 order was still suspended), the circuit court denied the motion for reconsideration by order titled "Final Order." Harman then filed his notice of appeal on July 26, 2024—15 days later and well before the 30-day deadline to file a notice of appeal.

## II. ANALYSIS

### A. Harman's Timely Appeal of the Final Order

Prior to oral argument, this Court directed the parties to be prepared to answer questions concerning this Court's jurisdiction to hear this appeal, and whether Harman's notice of appeal was timely. As a threshold matter, we address which order—the February 7, 2024 order or the March 11, 2024 suspended order combined with the July 11, 2024 order—was the final order.

"[W]hether a particular order is a final judgment is a question of law that [we] will review *de novo*." *Ritchie v. Commonwealth*, 74 Va. App. 328, 332 (2022) (citing *Rusty's Welding Serv., Inc. v. Gibson*, 29 Va. App. 119, 127 (1999) (*en banc*)). Even so, it "is not always easy to determine" when an order is final. *Dir. of Dep't of Corrs. v. Kozich*, 290 Va. 502, 512 (2015) (quoting *Brooks v. Roanoke Cnty. Sanitation Auth.*, 201 Va. 934, 936 (1960)). The Rules of the Supreme Court are likewise reviewed de novo. *See Sidar v. Doe*, 80 Va. App. 579, 583 (2024).

Rule 5A:6(a) states, "no appeal will be allowed unless, within 30 days after entry of final judgment or other appealable order or decree, . . . counsel files with the clerk of the trial court a notice of appeal." *See also* Code § 8.01-675.3 ("[A] notice of appeal to the Court of Appeals . . . shall be filed within 30 days from the date of any final judgment order, decree, or conviction.").

"'To determine the timeliness of a notice of appeal from a final judgment, obviously it is first necessary to determine the date of the action of the trial court that constitutes the final judgment,' which is generally marked by the entry of a final order." *Zeng v. Wang*, 82 Va. App. 326, 341 (2024) (quoting *Jefferson v. Commonwealth*, 298 Va. 473, 475 (2020)).

"It is settled law in Virginia that an order is final when it 'disposes of the entire action and leaves nothing to be done except the ministerial superintendence of execution of the judgment.'" *Commonwealth v. McBride*, 302 Va. 443, 451 (2023) (quoting *Super Fresh Food Mkts. of Va. v. Ruffin*, 263 Va. 555, 560 (2002)).

This concept is enshrined in Rule 1:1(b), which states:

> Unless otherwise provided by rule or statute, a judgment, order, or decree is final if it disposes of the entire matter before the court, including all claim(s) and all cause(s) of action against all parties, gives all the relief contemplated, *and leaves nothing to be done by the court except the ministerial execution of the court's judgment, order, or decree.*

(Emphasis added).

Rule 1:1(d) further defines when orders granting summary judgment are final orders:

> An order sustaining a plea in bar or sustaining a plea in bar with prejudice or without leave to amend is sufficient to dispose of a claim(s) or cause(s) of action subject to the plea in bar, as is an order granting a motion for summary judgment, even if the order does not expressly dismiss the claim(s) or cause(s) of action at issue or enter judgment for the moving party.

However, a circuit court may retain jurisdiction over a matter after issuing what would otherwise be considered a final order by "expressly provid[ing] that the court retains jurisdiction to reconsider the judgment or to address other matters still pending in the action before it." *Ruffin*, 263 Va. at 561. Nevertheless, there are no magic words a court must invoke to retain jurisdiction. *See Zeng*, 82 Va. App. at 343. As this Court recently stated, "'The distinction between an order that renders judgment and retains jurisdiction and an order that renders

judgment but does not retain jurisdiction' is often language that 'expressly indicate[s] that the order was not rendering final judgment.'" *Zeng*, 82 Va. App. at 342 (alteration in original) (quoting *Ruffin*, 263 Va. at 561-62). Indeed, in *Zeng*, this Court held that a circuit court's order stating that a plea in bar "will be sustained" was sufficient to retain jurisdiction because when "'[t]he future tense is formed by using *will* with the verb's stem word'; '[i]t refers to an *expected act*.'" *Id.* at 343 (emphases in original) (second alteration in original) (quoting The Chicago Manual of Style § 5.125 (16th ed. 2010)).

"In construing the language of rules and statutes, 'we must give effect to the [drafters'] intention[s] as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity.'" *Peed v. Va. DOT*, 72 Va. App. 686, 695 (2021) (alterations in original) (quoting *Muse Constr. Grp., Inc. v. Commonwealth Bd. for Contractors*, 61 Va. App. 125, 130-31 (2012) (*en banc*)). Rule 1:1(d) instructs that an order granting a motion for summary judgment is "sufficient to dispose of a claim." Therefore, our analysis must first determine what it means to "dispose of a claim." For an explanation of what it means to "dispose of a claim," we find the answer in Rule 1:1(b). Rule 1:1(b) requires that an order—including even an order granting summary judgment—is final if it "leaves nothing to be done by the court except the ministerial execution of the court's judgment." Here, what remained for the court to do, based on its clear statement, was to issue the memorandum opinion explaining its reasons for granting summary judgment—and its statement that it also then still needed to issue "a final order" in this case explaining its decision and dismissing the case.

When a trial court specifies "in a written order that it will issue a memorandum opinion explaining the basis for its decision, such an order is not final until the court has issued the memorandum opinion, along with a final order." *Chesapeake Bay Found., Inc. v.*

*Commonwealth ex rel. Va. State Water Control Bd.*, No. 1897-12-2, slip op. at 10, 2014 Va. App.

LEXIS 149, at *16 (Apr. 22, 2014).[4]  As Judge McCullough explained in *Chesapeake Bay*,

> A memorandum opinion is a substantive event in the life of the case that guides the parties' ability to lodge appropriate objections, to ask for reconsideration in the limited circumstances where reconsideration is warranted, and, should the case be appealed, affords the appellate court a controlling explanation of the trial court's reasoning.

*Id.*, slip op. at 9, 2014 Va. App. LEXIS 149, at *15.

Here, the February 7, 2024 order granted summary judgment but explicitly specified, "A memorandum opinion and final order dismissing the case will be forthcoming."  The subsequent March 11, 2024 memorandum opinion played a vital role in the life of the case, in which the circuit court explained to the parties—and to this Court on appeal—its precise reasons for granting summary judgment.  It simply cannot be said that Judge Cavedo's 13-page memorandum opinion addressing the deficiencies in each prong of Harman's VFATA claim amounted to nothing more than "the ministerial execution of the court's judgment" that Rule 1:1(b) discusses.  Therefore, the February 7, 2024 order was not the final order because the

---

[4] We acknowledge that this opinion is unpublished.  However, "[a]lthough not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Jones v. Commonwealth*, 71 Va. App. 375, 382 n.2 (2019) (quoting *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012)).

We further acknowledge that this opinion predated the promulgation of Rule 1:1(d). However, as we discuss *infra*, Rule 1:1(d) does not decide the case now before this Court. *Chesapeake Bay* came to this Court from an appeal from the State Water Control Board to the circuit court.  Although the procedural posture of *Chesapeake Bay* differs from the case now before us, the circuit court's decision on the petition for appeal in *Chesapeake Bay* was dispositive, just as the grant of summary judgment was here.  As such, any difference in procedural posture is immaterial to our analysis, and we find that *Chesapeake Bay*'s discussion of the function of a circuit court's memorandum opinion is on point and is thus applicable in this case.  Moreover, even if the *Chesapeake Bay* panel had Rule 1:1(d) when it decided that case, it would not have changed the outcome in that case.  That is because Rule 1:1(d) would not have applied to an appeal from the State Water Control Board as Rule 1:1(d) addresses pleas in bar and motions for summary judgment.  Thus, the fact that *Chesapeake Bay* predated Rule 1:1(d) does not change its crucial discussion of the important function of a circuit court's memorandum opinion and its applicability to the case now before us.

subsequent issuing of a memorandum opinion, "a substantive event in the life of the case," was necessary for the circuit court to dispose of the claim. *Chesapeake Bay*, slip op. at 9, 2014 Va. App. LEXIS 149, at *15.

Furthermore, not only did the circuit court say that it would be issuing an opinion explaining its decision in this case, it also said that "a final order dismissing the case will be forthcoming." That is a clear statement by the circuit court in a written order that it has more substantive things yet to do. This is no mere insinuation or implication, but rather a clear statement that this current February 7, 2024 order is not a final order. In short, the circuit court was clearly saying that its current February 7, 2024 order was *not* a final order because "a final order dismissing the case will be forthcoming."

Even if the February 7, 2024 order was sufficient to dispose of the claim, we find that the circuit court's language in that order—"A memorandum opinion *and final order* dismissing the case *will be forthcoming*"—"expressly indicate[d] that the order was not rendering final judgment" and was therefore sufficient to retain jurisdiction after granting summary judgment. *Zeng*, 82 Va. App. at 342 (quoting *Ruffin*, 263 Va. at 561-62). A circuit court is not required to explain itself. *See Shannon v. Commonwealth*, 289 Va. 203, 206 (2015). However, when a circuit court tells parties it plans to issue a memorandum opinion—and a final order—it should have some legal effect. To hold otherwise would put parties in an impossible position— requiring them to either (1) ignore the circuit court's very own language and appeal with little idea on what grounds the circuit court granted summary judgment (and thus with little idea on what grounds they would need to object), or (2) take the risk that the court would, in fact, issue a memorandum opinion and final order, and hope that they had not thereby lost their opportunity to appeal. After all, parties can only proceed based on what the circuit court represents in its orders. *See Fredericksburg Constr. Co. v. J.W. Wyne Excavating, Inc.*, 260 Va. 137, 143-44

- 10 -

(2000) ("It is the firmly established law of this Commonwealth that a trial court speaks only through its written orders."). To hold otherwise would be to penalize parties for listening to the circuit court. Furthermore, in every ruling granting summary judgment but saying a memorandum opinion is forthcoming, the trial court would have only 21 days to craft an extensive memorandum opinion before losing jurisdiction—a feat that would often not be possible.[5]

Moreover, while Rule 1:1(d) establishes that an order granting summary judgment *can* be a final order, it does not always require it to be. "[T]rial courts have the authority to interpret their own orders." *Id.* (citing *Rusty's Welding*, 29 Va. App. at 129). The Supreme Court has stated, "when construing a lower court's order, a reviewing court should give deference to the interpretation adopted by the lower court." *Id.* (citing *Rusty's Welding*, 29 Va. App. at 129). In this case, to reiterate, the circuit court clearly did not consider the February 7, 2024 order to be a final order, as it stated in that order, "A memorandum opinion *and final order* dismissing the case will be forthcoming." (Emphasis added). The March 11, 2024 order, on the other hand, was styled as "Memorandum Opinion and Final Order" and stated, "This is a final order." Deferring to the circuit court's interpretation of its own orders, and reading the February 7, 2024 order in conjunction with the March 11, 2024 order, we hold that the March 11, 2024 "Memorandum Opinion and Final Order" was, as the name suggests, the final order.

In short, this Court has jurisdiction to hear the merits of this appeal. The February 7, 2024 order was not the final order because it left something very important for the circuit court

---

[5] This Court does not intend to imply that when a circuit court issues an order without an explanation, that order is insufficient to dispose of a claim, nor does this Court imply that a circuit court must explain its decision for an order to be final. However, when a circuit court announces its intention to explain its decision in a forthcoming memorandum opinion (and in a forthcoming *final order*), that memorandum opinion serves a much more important function than a mere "ministerial execution of the court's judgment."

- 11 -

to do—i.e., to issue (1) the memorandum opinion and (2) the final order explaining the court's decision and dismissing the case, which it did on March 11, 2024. That order was the final order, as it "dispose[d] of the entire matter before the court, including all claim(s) and all cause(s) of action against all parties, [gave] all the relief contemplated, and [left] nothing to be done by the court." Rule 1:1(b). Harman's notice of appeal was thus timely as the circuit court then suspended its March 11, 2024 order 15 days later on March 26, 2024, in order to consider "the forthcoming Plaintiff's Motion for Reconsideration." The circuit court then issued an order titled "Final Order" on July 11, 2024, in which it denied Harman's motion for reconsideration. Harman filed his notice of appeal from the July 11, 2024 order on July 26, 2024 (only 15 days later and well within the 30-day deadline for filing a notice of appeal). Therefore, for all these reasons, his appeal was timely filed.

### B. No Error in Granting Summary Judgment

On appeal, Harman argues, "The trial court reversibly erred by granting summary judgment for Defendants-Appellees with respect to the Commonwealth and Relator's claim under the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 *et seq.*, despite the presence of numerous disputed issues of fact." He assigns error to the circuit court's findings on each prong of VFATA: falsity, knowledge, and materiality.

"Summary judgment is appropriate in cases where no 'material fact is genuinely in dispute' and the moving party is entitled to judgment as a matter of law." *Ranger v. Hyundai Motor Am.*, 302 Va. 163, 169 (2023) (quoting Rule 3:20). "In an appeal from a circuit court's decision to grant or deny summary judgment, we review the application of the law to undisputed facts de novo." *Id.* (citing *Deutsche Bank Nat'l Tr. Co. v. Arrington*, 290 Va. 109, 114 (2015)).

The Virginia Fraud Against Taxpayers Act provides:

> Any person who:
>
> 1.  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> 2.  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> . . . shall be liable to the Commonwealth for a civil penalty.

Code § 8.01-216.3(A). The Supreme Court has stated, "The VFATA is based on the federal civil False Claims Act (FCA)." *Lewis v. City of Alexandria*, 287 Va. 474, 479 n.4 (2014). And the Court noted, "The FCA cases thus provide guidance for our review in this appeal." *Id.*

On appeal, Harman argues, "The trial court reversibly erred by granting summary judgment . . . because a jury could reasonably find that [Trinity's] factual statements and representations were false and that [Trinity] was required to disclose product modifications." In essence, they argue on appeal what the Commonwealth argued to the circuit court below—that Trinity engaged in (1) express falsity by delivering "a different product than what VDOT had approved and what the contractors thought they were buying," and (2) implied falsity by failing "to disclose noncompliance with material statutory, regulatory, or contractual requirements."

### 1. Express False Certification

On appeal, Harman asserts that the circuit court erred by concluding that Trinity did not make any false statements or representations.

Neither the VFATA nor the FCA define the phrase "false or fraudulent." Thus, we must look to the common law meaning of the phrase. *See Foley v. Commonwealth*, 63 Va. App. 186, 193-94 (2014); *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 200 (4th Cir. 2022).

> At common law, a false statement encompassed any "words or conduct" that "amount[] to an assertion not in accordance with the truth," including a "representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading

because of his failure to state additional or qualifying [information]."

*Boyko*, 39 F.4th at 200-01 (alterations in original) (first quoting Restatement (Second) of Torts § 525 cmt. b (1977); and then quoting *id.* § 529).

When Trinity submitted its certifications to contractors, it represented that the 4-inch ET Plus was the "E.T. PLUS EXTRUDER TERMINAL" and that it was "NCHRP Report 350 Compliant." Both of these representations were true. The FHWA confirmed that the ET Plus enjoyed "[a]n unbroken chain of eligibility for Federal-aid reimbursement" after confirming that the 4-inch ET Plus was successfully tested "to the relevant crash test standards (NCHRP Report 350) . . . in May 2005." Thus, at all relevant times, the ET Plus was, in fact, compliant with Report 350. While we may inquire as to why Trinity did not rename the product or notify VDOT of the changes, resolving that question would have no bearing on the truth of Trinity's certification that the ET Plus—whether a 4-inch model or a 5-inch model—was, in fact, still an ET Plus (and was NCHRP Report 350-compliant).

## 2. Implied False Certification

Liability may attach under a theory of "implied false certification." *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016). "When, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.* at 187.

"The False Claims Act does not contain an independent duty to disclose certain information." *United States ex rel. Harman v. Trinity Industries*, 872 F.3d 645, 667 n.90 (5th

Cir. 2017), *cert. denied*, 586 U.S. 1067 (2019).[6]  "There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information."  *Id.* (quoting *United States ex rel. Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997)). It is not disputed that Trinity did not inform its customers or VDOT of the 2005 design change. However, whether this amounts to falsity by omission turns on whether Trinity was required to disclose the change.

For example, in *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 175 (4th Cir. 2017), the federal government awarded Triple Canopy a contract to provide security at an airbase in Iraq.  The contract required that Triple Canopy's guards met certain marksmanship requirements, including "ensur[ing] that all employees have . . . qualified on a U.S. Army qualification course." *Id.* (alterations in original).  When Triple Canopy employed guards who had not met this requirement, "[r]ather than inform the Government of this deficiency, Triple Canopy falsified the scorecards on several occasions throughout the year.  Triple Canopy submitted invoices for its guards on a monthly basis but was not required to certify that its guard services complied with the contract's responsibilities." *Id.* at 175-76.  The Fourth Circuit held that this constituted a "half-truth" actionable under the FCA, as "anyone reviewing Triple Canopy's invoices 'would probably—but wrongly—conclude that [Triple Canopy] had complied with core [contract] requirements.'" *Id.* at 178 (alterations in original) (quoting *Escobar*, 579 U.S. at 189).

Here, Harman can point to no requirement equivalent to the contractual provision in *Triple Canopy.*  On brief, Harman argues that "VDOT approval is a prerequisite to installation of highway safety products along Virginia's highways" and that "VDOT was required to be notified

---

[6] Although this case is not binding on this Court, our Supreme Court has stated that federal cases that interpret the FCA, the federal analog to VFATA, can "provide guidance for our review." *Lewis*, 287 Va. at 479 n.4.  Moreover, this Court finds this particular case to be highly persuasive, given that it involves the same parties and the same product.

of changes to approved products." Harman relies heavily on VDOT's Road and Bridge Standards, which he alleges represents VDOT's position that "if a VDOT[-]approved design was later modified, the new design must be submitted to VDOT before [it is] installed in Virginia." The Road and Bridge Standards expressly identified that the ET Plus's predecessor, the ET-2000, was approved for installation, but also permitted the use of "other VDOT approved" products "meeting NCHRP 350 testing criteria." In other words, under the VDOT Road and Bridge Standards, any product that complied with Report 350 was approved for use in Virginia. As discussed *supra*, the FHWA confirmed that the 4-inch ET Plus complied with Report 350 and enjoyed "[a]n unbroken chain of eligibility for Federal-aid reimbursement." Because the 4-inch ET Plus complied with Report 350, as confirmed by the FHWA, the 4-inch ET Plus was acceptable under VDOT's Road and Bridge Standards and thereby approved for use on Virginia highways. The VDOT Road and Bridge Standards did not impose any additional or independent requirement that design changes be disclosed to VDOT.

While it is true that all contractors are subject to the VDOT Road and Bridge Standards, the standards do not impose a disclosure requirement for design changes to approved products. In fact, the Commonwealth admitted below in the circuit court that the VDOT Road and Bridge Standards only required that Report 350-compliant products be installed on state highways—which the ET Plus was at all times. Moreover, the ET Plus was on the Approved Products List—and thus approved by VDOT—for years after VDOT learned of Harman's allegations. Any allegation of falsity by omission fails because Harman has failed to prove that Trinity was required to disclose the design change. In other words, Harman cannot prove implied false certification because he cannot prove that Trinity was required to certify the truth of a particular thing here.

Harman's reliance on VDOT's form contracts, invoices, and the Guardrail Installation Training Manual is equally unpersuasive. At all relevant times, there was simply no VDOT rule requiring Trinity to seek reapproval for a design change to the ET Plus, and without such a requirement, Harman's theory of implied false certification fails. *See United States ex rel. Harman*, 872 F.3d at 667 n.90 ("There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information.").

Based on the foregoing, we hold that there was no dispute as to any material fact regarding whether Trinity engaged in (1) express false certification or (2) implied false certification. *See* Rule 3:20.[7] We hold that Trinity's representations to its customers in its Certificates of Compliance that the ET Plus was Report 350-compliant were accurate and truthful given that the FHWA itself confirmed that the ET Plus was, at all relevant times, Report 350-compliant. We further hold that Harman did not carry his burden of proving that VDOT required Trinity to disclose these design modifications to VDOT so, therefore, a failure to disclose this design change is not implied false certification.

To succeed on his claim under VFATA, Harman was required to prove (1) falsity, (2) knowledge, *and* (3) materiality. *See* Code § 8.01-216.3(A)(1), (2). Given that Harman cannot prove falsity, he cannot succeed on his VFATA claim and we therefore do not need to reach the remaining prongs of knowledge and materiality in the three-part test.[8] We affirm the order of the

_____

[7] Harman also asserts that the circuit court erred by "rel[ying] on forbidden materials to grant summary judgment in derogation of Rule 3:20." However, Harman failed to make any contemporaneous objection to the trial court's reliance on "forbidden materials" below, so his argument is waived on appeal, and we do not reach it. *See* Rule 5A:18.

[8] On March 24, 2026, Harman filed with this Court a notice providing supplemental authority, advising this Court of the Fourth Circuit's recent decision in *United States ex rel. Sheldon v. Allergan Sales, LLC*, No. 24-1793, 2026 U.S. App. LEXIS 8153 (4th Cir. Mar. 13, 2026). Given that this Court resolves Harman's VFATA claim on the *falsity* prong, and given that this new Fourth Circuit case addresses the Fourth Circuit's interpretation of the False Claims

circuit court granting summary judgment in favor of Trinity on this basis as we do not need to reach Harman's other assignments of error that deal with knowledge and materiality. *See Toll Rd. Invs. P'ship II L.P. v. State Corp. Comm'n*, 304 Va. 352, 368 (2025) ("Our doctrine of judicial restraint requires appellate courts to decide cases on the best and narrowest ground available." (quoting *Rebh v. Cnty. Bd. of Arlington Cnty.*, 303 Va. 379, 382 (2024))).

### C. The Joint Motion for Reconsideration

On appeal, Harman contends that the circuit court's denial of his and the Commonwealth's joint motion for reconsideration was error because there "was an error on the face of the trial court's memorandum opinion."

"Motions to reconsider are available where there is an 'error apparent on the face of the record, or for the purpose of introducing after-discovered evidence.'" *Rosson v. Erie Ins. Exch.*, 79 Va. App. 266, 283 (2023) (quoting *Kirn v. Bembury*, 163 Va. 891, 901 (1935)). Having concluded that the trial court did not err by granting Trinity's motion for summary judgment, we also find no error on the face of the trial court's memorandum opinion. Harman and the Commonwealth asserted below that "the bulk of the [joint motion to reconsider] is dedicated to summarizing . . . new evidence and identifying where it creates a material factual dispute." However, in his brief to this Court, Harman does not point to any after-discovered evidence that would have compelled the circuit court to grant the joint motion for reconsideration. Thus, we also affirm the trial court's denial of the joint motion for reconsideration.

### III. CONCLUSION

For all of the foregoing reasons, we do not disturb the judgment of the circuit court.

*Affirmed.*

---

Act's *knowledge* requirement, Harman's supplemental authority has no actual impact on the outcome of this case (and does not affect the analysis this Court uses to reach that outcome).

Athey, J., dissenting.

"Whether a judgment, decree, or order is *final or not*, is sometimes a question of grave perplexity." 4 John B. Minor, *Institutes of Common and Statute Law* 1066 (3d ed. 1893). And it is also a question of grave importance: in the ordinary course of a civil appeal, prospective appellants must file a notice of appeal within 30 days of the entry of a *final* judgment, decree, or order of a circuit court. Rule 5A:6; Code § 8.01-675.3. This being a jurisdictional requirement, the Court has no discretion to allow an untimely appeal. *See Ghameshlouy v. Commonwealth*, 279 Va. 379, 390-91 (2010); *Wells v. Shenandoah Valley Dep't of Soc. Servs.*, 56 Va. App. 208, 212 (2010). Because I am compelled to conclude that the notice of appeal filed in this case was untimely, I respectfully dissent from the majority's conclusion that this Court has jurisdiction to decide this appeal on the merits. Thus, I would have simply dismissed the appeal for lack of jurisdiction without opining on the merits.

Since an appellate jurisdictional inquiry is invariably intertwined with the procedural history of a given case, the procedural history here is important and bears repeating. Over ten years after the relator, Joshua M. Harman ("Harman"), initiated this qui tam action on behalf of the Commonwealth against Trinity Industries, Inc. and Trinity Highway Products, LLC (collectively, "Trinity"), the Circuit Court of the City of Richmond ("circuit court") granted Trinity's motion for summary judgment by order entered on February 7, 2024.[9] The text of the February 7, 2024 order, in relevant part, stated: "The Court hereby GRANTS Defendants' Motion for Summary Judgment. It is ORDERED that the trial dates and hearing dates for this matter be removed from the Court's docket. A memorandum opinion and final order dismissing the case will be forthcoming." The circuit court subsequently issued a "Memorandum Opinion

---

[9] The pleadings filed by both Harman and the Commonwealth set forth a single count alleging that Trinity violated the Virginia Fraud Against Taxpayers Act.

and Final Order" on March 11, 2024. Said memorandum opinion and order claimed to be "a final order" but referenced the circuit court's previous order, stating that "[t]he Court GRANTED Defendants' Motion for Summary Judgment by way of separate Order on February 7, 2024, and accordingly this case is DISMISSED."

Because the March 11, 2024 memorandum opinion and order was neither served on counsel of record for the Commonwealth nor served on counsel for Harman, the Commonwealth and Harman filed a joint motion to suspend the memorandum opinion and order on March 20, 2024, which Trinity opposed. By order entered on March 26, 2024, the circuit court granted the motion to suspend, and the Commonwealth was given 21 days to file a motion for reconsideration of the memorandum opinion and order. On April 16, 2024, the Commonwealth and Harman filed a joint motion for reconsideration, which the circuit court denied by order entered on July 11, 2024. Harman subsequently filed a notice of appeal on July 26, 2024, identifying the March 11, 2024 order as "the final judgment."

To begin with, I agree with the majority that the Rules of the Supreme Court— specifically, Rules 1:1(b) and 1:1(d)—apply here for purposes of determining whether the circuit court's February 7, 2024 order granting summary judgment was a final order thereby triggering the 30-day period within which Harman was required to file a notice of appeal. Hence, I also agree with the majority that as a prerequisite to finality, an order must "dispose[] of the entire matter before the court, including all claim(s) and all cause(s) of action against all parties, give[] all the relief contemplated, and leave[] nothing to be done by the court except the ministerial execution of the court's judgment, order or decree." Rule 1:1(b). And I further agree with the majority that Rule 1:1(d) provides that an order granting summary judgment possesses a key attribute of finality:

> An order sustaining a plea in bar or sustaining a plea in bar with
> prejudice or without leave to amend is sufficient to dispose of a

- 20 -

claim(s) or cause(s) of action subject to the plea in bar, *as is an order granting a motion for summary judgment*, even if the order does not expressly dismiss the claim(s) or cause(s) of action at issue or enter judgment for the moving party.

(Emphasis added).

I would have held that, under Rule 1:1(d), the circuit court's February 7, 2024 order granting summary judgment was "sufficient to dispose" of Harman's claim. *Cf. DiLeonardo v. Fanous*, 83 Va. App. 706, 710, 716 (2025) (holding that under Rule 1:1(c), an order sustaining a demurrer and granting leave to amend but not containing language regarding dismissal of the case, "was sufficient—in that it was enough or legally adequate—to dispose of the claim and thus was a final order"). When a rule of the Supreme Court states that an action is enough, completing said action is enough, and no further action is necessary to effectuate the result intended by the rule—finality. *See Commonwealth v. Morris*, 281 Va. 70, 77 (2011) ("We previously have stated that '[t]here are strong policy reasons favoring certainty of results in judicial proceedings. Accordingly, we attach a high degree of finality to judgments, whether obtained by default or otherwise. Rule 1:1 implements that policy, and we apply it rigorously, unless a statute creates a clear exception to its operation.'" (alteration in original) (quoting *McEwen Lumber Co. v. Lipscomb Bros. Lumber Co.*, 234 Va. 243, 247 (1987))). This axiom is demonstrated in Rule 1:1(d) itself, which dictates that a key element of finality—disposal of a claim or cause of action—is established by an order granting summary judgment, whether or not the order "expressly dismiss[es] the claim(s) or cause(s) of action at issue or enter[s] judgment for the moving party."

Because the February 7, 2024 order granted Trinity's motion for summary judgment on the sole claim before the circuit court, I am compelled to conclude that the February 7, 2024 order granting the motion for summary judgment "dispose[d] of the entire matter before the court, including all claim(s) and all cause(s) of action against all parties." Rule 1:1(b). Having

- 21 -

concluded that the order disposed of the entire matter, I now turn to the issue of whether, pursuant to Rule 1:1(b), the order "g[a]ve all the relief contemplated[] and le[ft] nothing to be done by the court except the ministerial execution of the court's judgment, order, or decree."

Relief is "[t]he redress or remedy . . . that a party asks of a court." *Relief*, *Black's Law Dictionary* (12th ed. 2024). Here, Trinity asked for summary judgment and was granted summary judgment. A written explanation of the circuit court's reasoning as expressed in the subsequent memorandum opinion was not required in order for the circuit court to grant Trinity the remedy it requested. Nor was it required at all. *See Lisann v. Lisann*, 304 Va. 242, 260 (2025). Hence, I am once again compelled to conclude that the February 7, 2024 order granting Trinity summary judgment was sufficient to grant all the relief that Trinity requested and to which Trinity was entitled—i.e., "all the relief contemplated." Rule 1:1(b).

To the extent that "all the relief contemplated" includes relief not requested by any party but "contemplated by the court" itself, *see Kellogg v. Green*, 295 Va. 39, 45 (2018) (quoting *Brooks v. Roanoke Cnty. Sanitation Auth.*, 201 Va. 934, 936 (1960)), Trinity could have received no "redress or remedy" from the circuit court's memorandum opinion different than what it received through the order granting summary judgment. *See Cocke's Adm'r v. Gilpin*, 40 Va. (1 Rob.) 20, 26 (1842) (opinion of Baldwin, J.) ("A decree is final, when it either refuses or grants the redress sought by the party complaining."). Indeed, the purpose of summary judgment "is to expedite litigation with as few technicalities as possible and thus avoid common law procedural tactics interposed for delay," *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 4-5 (1954), meaning that delaying finality after the entry of summary judgment to complete a memorandum opinion is no remedy. *See AlBritton v. Commonwealth*, 299 Va. 392, 404 (2021) (acknowledging summary judgment as a method of "bring[ing] litigation to an end at an early stage" (quoting *Carson ex rel. Meredith v. LeBlanc*, 245 Va. 135, 140 (1993))). A memorandum

opinion is thus best characterized as an optional task that *may* be completed after the entry of a final order, so long as the drafting court adheres to the strictures of Rule 1:1(a) and completes the memorandum opinion within 21 days after entry of the final order. This is so because, if a forthcoming memorandum opinion is viewed as part of the "relief contemplated," finality is forestalled for *all* purposes, not just the issuance of the memorandum opinion, allowing a court to change its mind and retract relief previously granted long after the Rule 1:1(a) 21-day period expires, which is no relief at all. Viewing a memorandum opinion as part of the "relief contemplated" could thus have serious, unintended consequences for the finality of judgments, which is why a circuit court must be held to the same deadline for incorporating a memorandum opinion into the record as it is for changing its mind after the entry of a final judgment. *See Lewis v. Commonwealth*, 295 Va. 454, 467 n.3 (2018) (noting that a court can reconsider a ruling "until twenty-one days have elapsed from the entry of the final judgment").

Finally, I disagree with the majority that something more than ministerial execution was left to be done by the circuit court following the entry of the February 7, 2024 order granting Trinity's motion for summary judgment. I simply cannot agree with the majority's conclusion that the drafting of the well-reasoned memorandum opinion represented a substantive task given the Supreme Court's decision in *City of Suffolk v. Lummis Gin Co.*, 278 Va. 270 (2009), where the Court held that an order was final despite the fact that outstanding issues remained on the court's docket regarding "attorney fees, costs and expenses." *Id.* at 277. Surely, if the matter of attorney fees, costs, and expenses may be left unresolved by a *final* order, the matter of drafting a memorandum opinion may also be left unresolved by a *final* order. In the absence of a timely suspending order, "the court still only ha[s] twenty-one days to resolve the issue" of attorney fees, costs, and expenses. *Id.* A memorandum opinion is no less substantive, and therefore, I

- 23 -

would hold that, here, the circuit court was required to enter its memorandum opinion within the 21-day timeframe prior to expiration of the court's jurisdiction.[10]

Even though, in my judgment, the February 7, 2024 order was imbued with all of the necessary attributes of a final order, I acknowledge that when a circuit court enters an order that would otherwise be considered final, it may "expressly provide[] that the court retains jurisdiction to reconsider the judgment or to address other matters still pending in the action before it." *Super Fresh Food Mkts. of Va.*, 263 Va. at 561. This effectively transforms a final order into an interlocutory order. *See id.* at 561-62. To do so, the court must "include '*specific* language stating that the court is retaining jurisdiction' over the case." *Monroe v. Monroe*, 302 Va. 387, 398 (2023) (quoting *Johnson v. Woodard*, 281 Va. 403, 409-10 (2011)). I take this to mean that our Supreme Court has articulated a clear-statement rule. *See Burkholder v. Palisades Park Owners Ass'n*, 76 Va. App. 577, 587 (2023). Unfortunately, the task of determining whether a court has included sufficient language to retain jurisdiction is not an easy one.

For example, a circuit court retains jurisdiction when it enters an order granting a nonsuit that includes a combination of the phrases "this Court shall retain jurisdiction of this matter to

---

[10] If a circuit court that plans to draft a memorandum opinion needs more than 21 days to do so, it has several options. It may draft and file a memorandum opinion *before* or *simultaneously with* the entry of an order granting summary judgment, as the 21-day period prescribed by Rule 1:1(a) does not begin before the entry of a final order. Additionally, a court that has already entered a final order may enter a subsequent order suspending the final order before the expiration of the 21-day period. *See* Rule 1:1(a). Finally, as described *infra*, a court may take action to preclude an order that would otherwise be considered a final order from attaining finality.

I also take this opportunity to note that drafting a memorandum opinion and entering it in the record is an honorable practice that, in many situations, is a beneficial endeavor. *See Lindsey v. Lindsey*, 158 Va. 647, 652-53 (1932) ("These [written] opinions [of the circuit court] are . . . often exceedingly useful and frequently serve to bring to our attention incidents of importance which would otherwise not be noted in the record, and which could not readily be made to appear, even by bills of exception. We approve the practice."). Nothing in my dissent should be read to dissuade circuit courts from authoring memorandum opinions. I only mean to say that, if a court does wish to write such an opinion, it must abide by Rule 1:1 in doing so.

consider any application for attorney's fees and costs" and "for [the] purposes of Rule 1:1, this is not a final order." *Johnson*, 281 Va. at 410 (alteration in original). Additionally, in *Concerned Taxpayers v. County of Brunswick*, 249 Va. 320, 331-33 (1995), our Supreme Court held that an order "dismissing [a] bill of complaint," stating "that [the court] would reconsider the [plaintiffs'] request to file an amended bill of complaint," and granting defendants "leave to file 'additional submissions and a Notice of Hearing upon their Motion for Sanctions within twenty-one (21) days after entry of this Order" was not a final order, nor was a subsequent order denying plaintiffs' motion for leave to amend where the order stated that the circuit court would "'retain jurisdiction' over the [defendants'] request for sanctions." *See also Super Fresh Food Mkts. of Va.*, 263 Va. at 561-62 (stating that *Concerned Taxpayers* demonstrates the "distinction to be drawn between an order that renders judgment and retains jurisdiction and an order that renders judgment but does not retain jurisdiction for purposes of when the twenty-one day time period under Rule 1:1 commences to run"). Recently, this Court found that an order providing that the circuit court would "hold a future hearing 'before entry of a final order'" and merely stating that "the plea [in bar] '*will* be sustained'" was not a final order despite failing to use the "'retained jurisdiction' language used in *Johnson*." *Zeng v. Wang*, 82 Va. App. 326, 343 (2024).

On the other hand, a "circuit court's attempt . . . to preserve the issue by including the statement: '[t]his suit shall remain on the docket for the Court to determine issues concerning attorney fees, costs and expenses incurred by [certain defendants]'" is insufficient to extend the court's jurisdiction past the Rule 1:1(a) 21-day mark. *Lummis Gin Co.*, 278 Va. at 277; *see also Carrithers v. Harrah*, 60 Va. App. 69, 74 (2012) ("[E]ven if an order granting a final judgment on the merits of a case contains express language indicating that the trial court intends to rule on a request for attorneys' fees at a future time, such language does not negate the fact that such an order is in fact a final judgment."). Similarly, language in an order providing that a party is "free

- 25 -

to file post judgement [sic] motions for sanctions" and that "[a]ny such motion filed is to be set at the discretion of the Court" does not "clearly declare[] that the trial court intended to indefinitely suspend the Rule 1:1 time period." *Monroe*, 302 Va. at 392, 398-99.

The lesson to be gleaned is that "Rule 1:1 does not require incantation; it requires specificity." *Russell v. Commonwealth*, 79 Va. App. 618, 625 (2024). A circuit court "does not speak through insinuation, innuendo, or the parties' agreed understanding." *Id.* at 626.

While the circuit court was not required to use any particular language, it did not express its intent to *retain jurisdiction* with specificity.[11] *See Johnson*, 281 Va. at 409-10; *Russell*, 79 Va. App. at 625-26; *Carrithers*, 60 Va. App. at 74-75. Rather, at best, the circuit court *implied* that it did not intend for the order to be a final order by stating "[a] memorandum opinion and final order dismissing the case will be forthcoming." However, that statement of intent falls short of the provisos that our Supreme Court has found sufficient to retain jurisdiction. *See Johnson*, 281 Va. at 410; *Concerned Taxpayers*, 249 Va. at 331-32; *see also Chesapeake Bay Found., Inc. v. Commonwealth ex rel. Va. State Water Control Bd.*, No. 1897-12-2, slip op. at 32-35, 2014 Va. App. LEXIS 149, at *53-56 (Apr. 22, 2014) (Chafin, J., dissenting) (stating that a dismissal order that "contemplated a memorandum opinion to follow" was a final order that "gave all the relief contemplated and left nothing to be done by the court").[12] And the circuit

---

[11] I recognize that a circuit court is in the best position to discern whether it intended to retain jurisdiction. Nevertheless, that intent must be expressed through "'*specific* language stating that the court is retaining jurisdiction' over the case." *Monroe*, 302 Va. at 398 (quoting *Johnson*, 281 Va. at 409-10). Indeed, an attempt to prevent finality is ineffective without the inclusion of such specific language in "what would otherwise be a final order." *Id.*; *see Lummis Gin Co.*, 278 Va. at 277; *Russell*, 79 Va. App. at 625-26.

[12] In pertinent part, the order in *Chesapeake Bay Foundation* read as follows: "This matter is before the Court on the Petition for Appeal filed by the Appellants. For reasons stated in a Memorandum Opinion, to be issued by this Court, this Court finds the Appellants have not met their burden . . . . The Petition is hereby dismissed." No. 1897-12-2, slip op. at 7-8, 2014 Va. App. LEXIS 149, at *11-12. The majority reasoned that "[a] memorandum opinion is a substantive event in the life of the case" and held that when a circuit court "indicate[s] in a

court used no prospective language in granting summary judgment, *see Zeng*, 82 Va. App. at 343, rather, it merely contained "express language indicating that the . . . court intend[ed] to rule," which is insufficient. *Carrithers*, 60 Va. App. at 74. In short, the February 7, 2024 order granting summary judgment contained no clear declaration "that the trial court intended to indefinitely suspend the Rule 1:1 time period." *Monroe*, 302 Va. at 399.

Hence, I conclude that the February 7, 2024 order was a final order. Since Harman did not file his notice of appeal until July 26, 2024, the notice of appeal was untimely. *See* Rule 5A:6(a). I would therefore dismiss the appeal for lack of jurisdiction. *See Wells*, 56 Va. App. at 214. Although the result may be harsh, "the Rules of the Supreme Court are rules and not suggestions." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Eaton v. Wash. Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 332 n.1 (2016)). While I am sympathetic to the appellant, his counsel, and the circuit court, I believe that the result I would have reached in this case would lend clarity to future litigants, attorneys, and courts on whether they possess a final or interlocutory judgment. *See Cocke's Adm'r*, 40 Va. (1 Rob.) at 27 (opinion of Baldwin, J.) ("[I]t

---

written order that it will issue a memorandum opinion . . . , such an order is not final until the court has issued the . . . opinion, along with a final order[,] or . . . issues an order stating that it will not issue [the] opinion." *Id.*, slip op. at 10, 2014 Va. LEXIS 149, at *15-16. Further, the majority reasoned that "[a] contrary interpretation would create a formidable procedural trap for attorneys. Counsel should be entitled to rely upon the written representation of the court about a memorandum opinion without risking dismissal of their case on appeal." *Id.*, slip op. at 10, 2014 Va. LEXIS 149, at *16. Concluding, the majority wrote, "Our jurisprudence seeks to strike an appropriate balance between, on the one hand, finality and fairness to the parties and to the trial court with, on the other hand, the need to protect a right to appellate review. No rule of court or precedent controls this specific situation." *Id.*, slip op. at 11, 2014 Va. LEXIS 149, at *18-19.

The procedural-trap concerns presented by the majority in *Chesapeake Bay Foundation* and the similar concerns adopted by the majority here support our Supreme Court's adoption of a clear-statement rule for retention of jurisdiction. Under that rule, the presence or absence of "'*specific* language stating that the court is retaining jurisdiction' over the case," *Monroe*, 302 Va. at 398 (quoting *Johnson*, 281 Va. 409-10), informs the litigants of an order's status and whether to expect further action in the case outside of the Rule 1:1(a) 21-day window. Hence, in my view, adherence to our Supreme Court's clear-statement rule effectively balances the interests at stake. *See Chesapeake Bay Found., Inc.*, slip op. at 10-11, 2014 Va. App. LEXIS 149, at *16, 18-19.

becomes necessary to resort to some criterion by which the distinction between [interlocutory and final] decree[s] may be preserved: and I regard it as comparatively of but little importance what that criterion is, provided it be uniform, and capable of a certain application; for so soon as it becomes established, the courts of original cognizance, and the parties to the controversy, by conforming to the rule, will avoid the greatest inconvenience which can occur[]—that of uncertainty whether further judicial action is to be had in the inferior or the appellate tribunal.").

With great respect for the contrary opinion of my colleagues, I therefore respectfully dissent.